STATE OF NORTH CAROLINA v. RONNIE LEE KIMBLE, Defendant

No. COA99-981

(Filed 3 October 2000)

**1. Evidence— hearsay—statements against interest—accomplice's self-inculpatory statements—statements implicating defendant already admitted**

The trial court did not err in a first-degree murder case by allowing into evidence under N.C.G.S. § 8C-1, Rule 804(b)(3) a nontestifying accomplice's statements against the accomplice's penal interest, and statements both against the accomplice's penal interest and inculpating defendant, because: (1) testimony of only self-inculpatory statements by the accomplice are classic statements against interest that fall within a firmly-rooted hearsay exception; (2) even assuming the testimony of both the accomplice's self-inculpatory statements and statements that implicated defendant was error, such error was not prejudicial when the State presented overwhelming evidence that defendant committed the murder and that the evidence was properly admitted through other witnesses; and (3) collateral remarks inculpating defendant are not required to be redacted from an out-of-court statement that also contains self-inculpating remarks in order to admit the statement under N.C.G.S. § 8C-1, Rule 804(b)(3).

**2. Evidence— hearsay—not offered for truth of matter asserted**

The trial court did not err in a first-degree murder case by admitting various statements of the victim inquiring why the agent for an insurance company needed health information for a cancer insurance policy, and inquiring about the value of the policy once the victim found out that it was a life insurance policy, because: (1) the statements were offered to establish that the victim's husband had submitted the victim's life insurance application without her knowledge; and (2) the statements were not offered for the truth of the matters asserted.

**3. Evidence— hearsay—state of mind exception**

Even though the victim's statements contained descriptions of factual events, the trial court did not err in a first-degree murder case by admitting her statements under N.C.G.S. § 8C-1, Rule

803(3) that the victim's husband took out a life insurance policy without her knowledge, that her husband was not the man she married and had been acting differently, and that she was afraid she would not wake up in the morning since her husband slept with a gun underneath his pillow, because: (1) the statements were admissible to show the victim's state of mind; and (2) it was not necessary for the victim to state explicitly to each witness that she was afraid as long as the scope of the conversation related directly to her existing state of mind and emotional condition.

**4. Evidence— exclusion—not preserved for review—objectionable questions**

The trial court did not commit prejudicial error in a first-degree murder case by sustaining the State's objections to various questions during defendant's cross-examination of a detective, because: (1) the record fails to demonstrate what the detective's answers would have been had he been permitted to respond to defendant's questions; and (2) the questions were objectionable based on the fact that they were repetitive, argumentative, or called for speculation and conjecture.

**5. Evidence— direct examination—leading questions**

The trial court did not abuse its discretion in a first-degree murder case by sustaining the State's objections to various questions put to defendant on direct examination on the grounds that the questions were leading, because: (1) defendant had an opportunity to deny the charges against him; and (2) the questions were repetitious.

**6. Evidence— cross-examination—collateral matter—no prejudicial error**

The trial court did not commit prejudicial error in a first-degree murder case even though it allowed the State to question defendant during cross-examination on a collateral matter regarding three photographs of a woman found in defendant's cell to contradict defendant's statement that he holds nothing secret from his wife, because: (1) the subject was collateral to the issues before the jury and any error was thus unlikely to have impacted the outcome of the trial; (2) the inquiry by the State was extremely brief and was terminated by a sustained objection and an instruction to disregard the question; and (3) defendant had already testified that his wife had filed for divorce, significantly

decreasing the potential for prejudice resulting from any implication of defendant's interest in another woman.

**7. Evidence— allegations of prior insurance fraud—probative of truthfulness**

The trial court did not abuse its discretion in a first-degree murder case by allowing the State to question defendant regarding allegations that his brother and his parents had committed insurance fraud, because: (1) the possibility that defendant was aware of, and therefore conspired in, an insurance fraud scam undertaken by his brother and parents is arguably probative of defendant's truthfulness under N.C.G.S. § 8C-1, Rule 608(b); and (2) defendant failed to show an abuse of discretion.

Appeal by defendant from judgment entered 3 September 1998 by Judge C. Preston Cornelius in Guilford County Criminal Superior Court. Heard in the Court of Appeals 15 August 2000.

*Michael F. Easley, Attorney General, by James C. Gulick, Special Deputy Attorney General, for the State.*

*W. David Lloyd and John B. Hatfield, Jr., for defendant-appellant.*

SMITH, Judge.

Patricia Kimble (Patricia) was found dead in her home on 9 October 1995. An autopsy determined the cause of death was a gunshot wound to the side of her head. Patricia's body and the area of the house in which she was found had been burned. Investigators concluded the fire had been caused by arson.

Defendant is the brother of Patricia's husband, Ted Kimble (Ted). At trial, the State espoused the theory that Ted had decided to kill Patricia in order to collect the proceeds from her life insurance. The State further contended that Ted had recruited defendant to murder Patricia. The jury found defendant guilty of first-degree murder, conspiracy to commit murder, and first-degree arson.

I.

[1] Defendant first asserts the trial court erroneously allowed in evidence statements by Ted, a co-defendant in the crime who was tried separately. Defendant asserts the admission of these statements violated both North Carolina law, as well as defendant's Sixth

Amendment right to confront and cross-examine an adverse witness. Defendant's argument is without merit.

During defendant's trial, Ted invoked his Fifth Amendment privilege not to testify. Statements Ted made were then offered in evidence through the testimony of two witnesses, both of whom had been involved with Ted in a theft ring. All of the statements implicated Ted in the murder; some of the statements also implicated defendant in the murder. After conducting a *voir dire* hearing, the trial court admitted the statements pursuant to N.C.G.S. § 8C-1, Rule 804(b)(3) (1999) (statements against interest) (Rule 804(b)(3)) and N.C.G.S. § 8C-1, Rule 801(d)(E) (1999) (statement by co-conspirator in furtherance of conspiracy).

The first of these two witnesses, Robert Nicholes (Nicholes), testified that Ted told Nicholes the following: (1) Ted had been involved in Patricia's death but had not killed her; (2) Ted had attempted to take out a life insurance policy on Patricia and had forged her signature on the application; and (3) Ted was angry because the life insurance policy was not valid because Patricia had not taken a required physical examination. Notably, Nicholes did not testify that Ted had stated that defendant had been involved in the murder; Nicholes testified only to self-inculpatory statements made by Ted.

The second of these two witnesses, Patrick Pardee (Pardee), testified that Ted had told him the following: (1) defendant had gone to Ted's house, had shot Patricia in the head with Ted's pistol, and had then poured gasoline on her body and set it afire; (2) Ted had taken a second job to establish an alibi for himself; (3) the murder was committed to collect life insurance proceeds; (4) Ted realized he would be unable to collect on the life insurance policy because it was not in effect; and (5) Ted believed the police were closing in on him.

The State properly concedes "there is little basis for arguing that the statements were made during the course and in furtherance of the defendant's conspiracy with Ted to murder Patricia for her life insurance" as the conspiracy had ended. The issue on appeal, then, is limited to whether the statements were properly admitted under Rule 804(b)(3).

A.

An out-of-court statement by an unavailable witness may be admissible if the statement satisfies the definition of a "statement against interest," which is defined by Rule 804(b)(3) as

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

G.S. § 8C-1, Rule 804(b)(3).

Our Supreme Court has held that Rule 804(b)(3) requires a two-pronged analysis. *See State v. Wilson,* 322 N.C. 117, 134, 367 S.E.2d 589, 599 (1988). First, the statement must be "deemed to be against the declarant's penal interest." *Id.* Second, "the trial judge must be satisfied that corroborating circumstances clearly indicate the trustworthiness of the statement if it exposes the declarant to criminal liability." *Id.* The corroborating circumstances required by the second prong may include other evidence presented at trial. *See id.* (corroborating circumstances properly included fact that statement by unavailable witness accurately identified location of stolen items).

However, the analysis required in the case at bar is further complicated by a second hurdle. In addition to satisfying Rule 804(b)(3), the evidence also must satisfy the requirements of the Confrontation Clause of the Sixth Amendment. U.S. Const. amend. VI. In the recent case of *Lilly v. Virginia,* 527 U.S. 116, 144 L. Ed. 2d 117 (1999), the United States Supreme Court considered the issue of whether a criminal defendant's Sixth Amendment rights are violated by admitting in evidence a non-testifying accomplice's statement which contains both statements against the accomplice's penal interest and statements inculpating the defendant.

The four-Justice plurality in *Lilly* began by setting forth the fundamental principle that when the government seeks to offer an unavailable declarant's out-of-court statements against a criminal defendant, the court must decide whether the Confrontation Clause permits the government to deny the defendant an opportunity to cross-examine the declarant. *Id.* at 124, 144 L. Ed. 2d at 126. The plurality then reiterated the holding in *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597 (1980), that such statements may be admissible when

(1) "the evidence falls within a firmly rooted hearsay exception" or (2) it contains "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability.

*Lilly*, 527 U.S. at 124-25, 144 L. Ed. 2d at 127 (quoting *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608).

The plurality then explained that the categorization of an out-of-court statement as a "statement against penal interest" does not necessarily place the statement within a "firmly rooted hearsay exception" under the *Roberts* test because the label "statement against penal interest" defines too broad a class. *Id.* at 127, 144 L. Ed. 2d at 128. The plurality then defined three different categories of "statements against penal interest," *id.*, only one of which is pertinent here. The third category (statements offered as evidence by the prosecution to establish the guilt of an accomplice) encompasses the kind of "statements against interest" found in *Lilly*, i.e., those statements that inculpate both a declarant and a defendant. *Id.* at 130, 144 L. Ed. 2d at 130. Such dual-inculpatory statements are inherently unreliable and untrustworthy as the accomplice often stands to gain by inculpating another defendant. *Id.* at 131, 144 L. Ed. 2d at 131. The plurality concluded by stating: "[t]he decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." *Id.* at 134, 144 L. Ed. 2d at 133.

### B.

In light of this framework, the substantive differences between the testimony of Pardee and of Nicholes become extremely significant. While Pardee testified as to a conversation in which Ted made both self-inculpatory statements and statements that implicated defendant, Nicholes testified only to self-inculpatory statements by Ted. Such purely self-inculpatory statements, unlike the dual-inculpatory statements in *Lilly*, are classic "statements against interest" and thus fall within a firmly-rooted hearsay exception. *See id.* at 131-32, 144 L. Ed. 2d at 131-32.

Having concluded that the admission of Nicholes' testimony did not violate defendant's Sixth Amendment rights, we now proceed to analyze Nicholes' testimony to determine whether it was properly admitted under Rule 804(b)(3). Applying the two-part test set forth in *Wilson*, we first note that the challenged statements unquestionably

were against Ted's penal interests at the time they were made, and, thus, "a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true." G.S. § 8C-1, Rule 804(b)(3). The statements, therefore, satisfy the first prong of the analysis.

Furthermore, sufficient corroborating evidence was admitted at trial to indicate the trustworthiness of the statements. Such evidence included: (1) Ted's efforts to take out additional life insurance policies on Patricia shortly before her murder, without her knowledge; (2) Patricia's statements to various friends shortly before her murder, conveying her fear, based on Ted's conduct and behavior, that Ted might be planning on killing her; and (3) testimony of Mitch Whidden (Whidden) regarding defendant's statements that provided the same portrayal of Ted's involvement in the murder as Ted's own statements. Thus, the second prong of the analysis is also satisfied. The trial court, therefore, did not err in admitting Nicholes' testimony.

C.

Pardee's testimony, however, presents precisely the kind of situation addressed in *Lilly*, in which the prosecution offers in evidence statements of an accomplice that inculpate both the accomplice and the criminal defendant. Because such dual-inculpatory statements are inherently unreliable, in that the declarant often stands to gain by inculpating another, *Lilly*, 527 U.S. at 131, 144 L. Ed. 2d at 131, such statements do not fall within a firmly-rooted exception to the hearsay rule, *id.* at 134, 144 L. Ed. 2d at 133. Thus, as to Pardee's testimony, the constitutional issue becomes whether the statements contain "particularized guarantees of trustworthiness." *Id.* at 135, 144 L. Ed. 2d at 133-34 (quoting *Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608).

Whether the statements at issue satisfy this standard requires an analysis for which only a few guidelines have been set by the Supreme Court. For example, the reliability of the statements must be established by the inherent trustworthiness of the statements themselves and cannot be established by an effort to "bootstrap on" the trustworthiness of other evidence at trial. *Id.* at 138, 144 L. Ed. 2d at 135.

In the instant case, we find it unnecessary to determine whether the statements offered through the testimony of Pardee contain "particularized guarantees of trustworthiness." Assuming *arguendo* that

the statements fail to meet this constitutional standard, and that admission of such statements was error, we believe such error was not prejudicial.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b) (1999). In the case at bar, we believe the State has successfully met this burden for two reasons. First, the State presented overwhelming evidence that defendant committed the murder even without the admission of Pardee's testimony. Second, the facts established through Pardee's testimony were properly admitted in evidence through other witnesses.

Whidden, an ordained Baptist minister and a personal friend of defendant, testified that in 1997 defendant visited Whidden at his home and stayed with Whidden and his family overnight. Whidden testified that during this visit defendant confessed to Whidden that he had killed Patricia at Ted's request and that he was to receive payment from Ted in return. Whidden testified that after defendant left his home, Whidden spoke with the Reverend Jerry Falwell (Falwell) to ask his advice about defendant's confession. After meeting with Falwell and Falwell's son, an attorney, Whidden checked into a hotel with his family because he was afraid that defendant might return to his home.

Thereafter, Whidden went to see defendant in an attempt to persuade him to turn himself in. When defendant refused to do so, Whidden returned home, met with another attorney, Frank Yeatts (Yeatts), and gave a statement to the State Bureau of Investigation (SBI). He then left his job and moved himself and his family out of state for six months until defendant was in prison because he feared for the safety of his family. Various elements of Whidden's testimony were corroborated by the testimony of Falwell, Yeatts, Whidden's wife, and an agent with the SBI.

Whidden's testimony demonstrates the strength of the State's case against defendant. In addition, much of the evidence established through Pardee's testimony was properly admitted through Whidden's testimony. Where evidence is properly admitted through one witness, the defendant will not be heard to complain that the same evidence, improperly admitted through a different witness, was prejudicial error. See, e.g., State v. Washington, 131 N.C. App. 156, 163-64, 506 S.E.2d 283, 288 (1998) (trial court's error was harmless beyond a rea-

STATE v. KIMBLE

[140 N.C. App. 153 (2000)]

sonable doubt where improperly admitted hearsay testimony was almost entirely repetitive of the properly admitted testimony of other witnesses at trial). Given these considerations, we conclude any constitutional error was harmless beyond all doubt.

As for the Rule 804(b)(3) analysis, our Supreme Court does not require that collateral remarks inculpating the defendant be redacted from an out-of-court statement that also contains self-inculpating remarks in order to admit the statement under Rule 804(b)(3). *See Wilson*, 322 N.C. at 133, 367 S.E.2d at 598 ("The fact that [the challenged statements] have dual inculpatory aspects does not take the statements outside the range of Rule 804(b)(3)."). The statements offered by Pardee contain the same self-inculpatory remarks as the statements offered by Nicholes. Accordingly, the statements offered by Pardee satisfy Rule 804(b)(3) for the same reasons as the statements offered by Nicholes, and the collateral remarks that inculpate defendant need not be redacted from the statements in order for the statements to be admissible. This assignment of error is overruled.

II.

[2] Defendant next alleges the trial court erred in admitting in evidence various statements by the victim, Patricia. The State called five witnesses to offer testimony regarding statements Patricia made at various times prior to her death. We find no error in the admission of these statements.

The first of these five witnesses, William Jarrell (Jarrell), an agent for a life insurance company, testified that: (1) Ted requested a $200,000 life insurance policy for Patricia; (2) Ted provided Jarrell with an insurance application allegedly signed by Patricia; (3) Jarrell called Patricia in order to obtain required health information; (4) during this phone call, when Patricia inquired as to why such information was necessary for a cancer insurance policy, Jarrell informed her the policy was for life insurance; and (5) when she further inquired about the value of the life insurance policy, Jarrell informed her it was for $200,000, at which point Patricia "slammed the phone down."

Defendant contends such statements constitute hearsay and were improperly admitted. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999). We find no error in the admission of Jarrell's testimony,

as the statements made by Patricia ("Why do you need this information for a cancer insurance?" and "How much life insurance?") were offered merely to establish that Ted had submitted Patricia's life insurance application to Jarrell without Patricia's knowledge. The statements were not offered for the truth of the matters asserted and, therefore, do not constitute hearsay.

**[3]** The second of the five witnesses was Linda Cherry (Cherry), a friend of Patricia. Cherry testified that Patricia told her the following shortly before her death: (1) she was concerned about the state of her marriage, and she believed Ted did not want to spend time with her anymore; (2) Ted had been acting differently, he had been getting agitated easily, and he had started to use profanity; (3) she did not like the fact that Ted had gotten a second job because she felt that they did not need the extra money.

The third of the five witnesses was Cara Dudley (Dudley), a close friend of Patricia. Dudley testified that Patricia told her the following shortly before her death: (1) in case anything strange ever happened to her, she wanted Dudley to know that she had discovered by accident that Ted had taken out a large insurance policy on her; (2) she did not know why Ted wanted so much additional life insurance because she already had one life insurance policy; and (3) Ted must have signed her name on the application because she had not signed her own name. Dudley also testified that Patricia was very upset, her voice was shaky during this conversation, and she was trying not to cry.

The fourth of these five witnesses was Rose Lyles (Rose), another friend of Patricia. Rose testified that Patricia told her: (1) she had found a life insurance application on which Ted had forged her signature; (2) Ted was not the man she married; (3) Ted slept with a gun underneath his pillow and when she went to sleep she feared that she might not wake up in the morning. Rose also testified that Patricia cried during the conversation and that Rose had never heard so much fear in anybody's voice.

The final of these five witnesses was Gary Lyles (Gary), Rose's husband and also a friend of Patricia. Gary testified that Patricia told him: (1) she had found a life insurance policy that Ted had taken out without her knowledge; (2) Ted had forged her signature on the application; (3) Ted was not the man she married; and (4) Ted slept with a gun underneath his pillow.

Defendant contends these statements were erroneously admitted under the hearsay exception provided by N.C.G.S. § 8C-1, Rule 803(3) (1999) (Rule 803(3)). Rule 803(3) allows the admission of hearsay testimony in evidence if it tends to show the victim's then existing state of mind or "emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." G.S. § 8C-1, Rule 803(3).

This Court was recently faced with a strikingly similar set of facts in *State v. Wilds*, 133 N.C. App. 195, 515 S.E.2d 466 (1999). In *Wilds*, the defendant Curtis Wilds was accused of the first-degree murder of his wife, Tonya Wilds (Tonya). At trial, the State offered testimony from multiple witnesses regarding statements made by Tonya within a few weeks before her murder. *Id.* at 203-04, 515 S.E.2d at 473-74. Testimony offered by the witnesses included the following statements by Tonya: (1) her husband had attempted to change her life insurance policy to designate himself as the named beneficiary; (2) she had once woken up in her bed during the night to discover her husband pouring gasoline on her nightgown; (3) she had an unhappy marriage filled with physical and emotional abuse; and (4) she was afraid her husband would try to kill her. *Id.* Many of the witnesses specifically testified that Tonya was shaking and tearful when she made such statements. *Id.*

The *Wilds* Court stated:

> [a]lthough statements that relate only factual events do not fall within the Rule 803(3) exception, statements relating factual events which tend to show the victim's state of mind, emotion, sensation, or physical condition when the victim made the statements are not excluded if the facts related by the victim serve to demonstrate the basis for the victim's state of mind, emotions, sensations, or physical condition.

*Id.* at 204-05, 515 S.E.2d at 474 (citations omitted).

The Court in *Wilds* therefore held that the statements were admissible to show Tonya's state of mind, despite the fact that the statements also contained descriptions of factual events. *Id.* at 205, 515 S.E.2d at 475. Similarly, we hold in the instant case that Patricia's prior statements were properly admitted to show her state of mind. Furthermore, as in *Wilds*, "it was not necessary for [Patricia] to state explicitly to each witness that she was afraid, as long as the 'scope of the conversation . . . related directly to [her] existing state of mind

and emotional condition.' " *Id.* at 206, 515 S.E.2d at 475 (quoting *State v. Mixion*, 110 N.C. App. 138, 148, 429 S.E.2d 363, 368, *disc. review denied*, 334 N.C. 437, 433 S.E.2d 183 (1993)).

Defendant argues that the case of *State v. Hardy*, 339 N.C. 207, 451 S.E.2d 600 (1994), "is directly on point" with the case at bar, and cites to *Hardy* for the proposition that "[s]tatements of fact, even those which might explain why the declarant was frightened or angry are not admissible." One searches in vain for such a proposition in *Hardy*.

In *Hardy*, our Supreme Court held that statements from the victim's diary describing the defendant's violent conduct, which "expresse[d] no emotion and seem[ed] to have been written in a calm and detached manner," *id.* at 229, 451 S.E.2d at 613, were not admissible under Rule 803(3) because they did not constitute statements of the victim's state of mind, and merely amounted to "a recitation of facts which describe various events," *id.* at 228, 451 S.E.2d at 612. The notion that the result in *Hardy* may be expanded beyond the particular facts in that case has previously been foreclosed by this Court. As we stated in *Wilds*,

> [t]his case is distinguishable from *Hardy* in that the statements in *Hardy* were taken from the victim's diary and contained descriptions of assaults and threats against the victim before she died but *did not reveal the victim's state of mind* or contain statements of the victim's fear of defendant.

*Wilds*, 133 N.C. App. at 205, 515 S.E.2d at 475 (emphasis added). This assignment of error is overruled.

III.

**[4]** Defendant next contends the trial court erred in sustaining the State's objections to various questions put to Detective James Church (Detective Church) during cross-examination by defendant. "It is well established that an exception to the exclusion of evidence cannot be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985).

It is undisputed that the record fails to demonstrate what Detective Church's answers would have been had he been permitted to respond to defendant's questions. "By failing to preserve evidence

for review, defendant deprives the Court of the necessary record from which to ascertain if the alleged error is prejudicial." *State v. Locklear*, 349 N.C. 118, 150, 505 S.E.2d 277, 296 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). Thus, defendant cannot show that the trial court's ruling with respect to the exclusion of this testimony was prejudicial.

Furthermore, even if we assume *arguendo* that the assignment of error is properly before us on appeal, and even if we assume, as defendant asks of us, that "Detective Church would have answered as the questions led," we find no error in the exclusion of this testimony. We agree with the State that the questions were objectionable because they were repetitive, argumentative, or called for speculation and conjecture. *See Wilson*, 322 N.C. at 135, 367 S.E.2d at 600. This assignment of error is overruled.

IV.

[5] Defendant next contends the trial court erred in sustaining the State's objections, on the grounds of leading, to six specific questions put to defendant on direct examination. The most significant of these questions was the following:

Q: Did your brother, Ted, ever tell you that he would pay you money if you would assist him in eliminating [Patricia]?

"A leading question is generally defined as one which suggests the desired response and may frequently be answered yes or no." *State v. Britt*, 291 N.C. 528, 539, 231 S.E.2d 644, 652 (1977) (citations omitted). "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." N.C.G.S. § 8C-1, Rule 611(c) (1999).

Defendant argues that in sustaining the State's objections, the trial court deprived defendant of an opportunity to "deny to the jury the fundamental charge against him—that his brother offered him money to kill his wife." Defendant is correct in asserting that each of the six questions at issue, to varying degrees, were efforts at rebutting the State's underlying theory that defendant conspired with Ted to murder Patricia. However, at the time of the sustained objections, defendant had already been provided ample opportunity to deny the State's charges against him. For example, a portion of the direct examination of defendant transpired as follows:

Q: Mr Kimble, last night, right before we broke, I asked you if you killed Patricia, and you said you did not.

A: Yes, sir.

Q: Did your brother ever ask you to do anything like that?

A: No.

Q: Did Ted ever tell you he was looking for a hit man?

A: No.

Q: Did you have any knowledge whatsoever of Ted's and Patricia's life insurance arrangements?

A: No.

"Rulings by the trial judge on the use of leading questions are discretionary and reversible only for an abuse of discretion." *State v. Smith*, 290 N.C. 148, 160, 226 S.E.2d 10, 18, *cert. denied*, 429 U.S. 932, 50 L. Ed. 2d 301 (1976) (citations omitted). "A trial court may be reversed for abuse of discretion only upon a showing that its [ruling was] manifestly unsupported by reason." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). Because defendant had had an opportunity to deny the charges against him, it was unnecessary to employ leading questions during the direct examination. Furthermore, the questions were repetitious. We find no abuse of discretion by the trial court in sustaining the State's objections. This assignment of error is overruled.

V.

[6] Defendant next asserts the trial court erred in allowing the State to question defendant during cross-examination regarding three photographs of a woman named Janet Smith. We find no prejudicial error.

The State elicited the following statement from defendant on cross-examination: "I don't know of many things that my wife—I don't know of anything that I—that my wife does not know today, that I hold in secret from her in any way. I think she knows everything there is to know about me." The State then sought to impeach defendant using three photographs of Janet Smith that had been seized from defendant's cell. Defendant objected, but after a *voir dire* hearing on the matter the trial court allowed the following inquiry by the State:

Q: And showing you then State's Exhibit 139-A, B and C, what are those?

A: These are pictures of Janet Smith.

Q: Were those in the book at the time it was taken?

A: I don't know if they were or not.

Q: Were those pictures in your possession on that day?

A: Yes.

Q: Did you tell your wife about those pictures?

MR. LLOYD: Well, objection, Your Honor.

A: Yes, I—

THE COURT: Sustained. Don't answer it.

MR. LLOYD: Move to strike, Your Honor.

THE COURT: Disregard the question, members of the jury.

The credibility of a witness may be impeached on cross-examination by questioning the witness regarding evidence that appears to be inconsistent with the testimony of the witness. *See* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 47 (3d ed. 1988). "However, contradiction of collateral facts by other evidence is not permitted, as its only effect would be to show that the witness is capable of error on immaterial points, and to allow it would confuse the issues and unduly prolong the trial." *Id.*

As a general rule, "collateral matters" are those that are irrelevant to the issues in the case. *See State v. Najewicz*, 112 N.C. App. 280, 289, 436 S.E.2d 132, 138 (1993), *disc. review denied*, 335 N.C. 563, 441 S.E.2d 130 (1994). In the case at bar, whether defendant told his wife about photographs of another woman found in his cell is clearly a collateral matter to the murder of his brother's wife. In seeking to contradict defendant's statement that he holds nothing secret from his wife, the State should have been limited to asking defendant to acknowledge the existence of the photographs, and then asking defendant whether he had told his wife about the photographs. Defendant's answers would have been conclusive on the matter, and the State would have been prohibited from offering extrinsic evidence to contradict the defendant.

However, we conclude the error does not require reversal. Reversible error exists where "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1999). Here, the subject was collateral to the issues before the jury and any error was thus unlikely to have impacted the outcome of the trial. Furthermore, the inquiry by the State was extremely brief, and was terminated by a sustained objection and an instruction to disregard the question. In addition, the defendant had already testified that his wife had filed for divorce, significantly decreasing the potential for prejudice resulting from any implication of defendant's interest in another woman. This assignment of error is overruled.

VI.

**[7]** Defendant lastly asserts the trial court erred in allowing the State to question defendant regarding allegations that his brother and his parents had committed insurance fraud. Over defendant's objection, the trial court allowed the State to briefly inquire into the matter. In response to the State's questions, defendant stated that no fraud had been committed and that until he read the discovery documents in the case he had no knowledge that such allegations even existed.

It is well-established that a defendant may be cross-examined, for impeachment purposes, concerning prior acts of misconduct, if such prior acts are probative of truthfulness or untruthfulness. N.C.G.S. § 8C-1, Rule 608(b) (1999). The possibility that defendant was aware of, and therefore conspired in, an insurance fraud scam undertaken by his brother and his parents is arguably probative of defendant's truthfulness. The propriety or unfairness of cross-examination rests largely in the trial judge's discretion, and "[h]is ruling thereon will not be disturbed without a showing of gross abuse of discretion." *State v. Foster*, 293 N.C. 674, 685, 239 S.E.2d 449, 457 (1977) (citations omitted). Defendant has shown no abuse of discretion here. We hold there was no error in allowing the State to briefly cross-examine defendant concerning allegations of insurance fraud. This assignment of error is overruled.

No error.

Judges GREENE and EDMUNDS concur.