STATE OF NORTH CAROLINA v. SHAN CARTER

No. COA02-24

(Filed 18 March 2003)

## 1. Evidence— hearsay—residual exception—unavailable witness

An out-of-court statement to officers by a witness who later married defendant and asserted marital privilege was properly admitted under the N.C.G.S. § 8C-1, Rule 804(b)(5) hearsay exception. The court conducted a two-day voir dire, determined

that the witness was unavailable, found that the statement had been made voluntarily after the witness was told about the marital privilege and that she wasn't going to be arrested, and each of the six factors for determining whether hearsay should be admitted under the residual hearsay exception was systematically analyzed.

## 2. Constitutional Law— confrontation—unavailable witness

The admission of pretrial statements to police by a witness who later married defendant and asserted marital privilege at trial did not violate defendant's constitutional rights to due process and confrontation.

## 3. Witnesses— marital privilege—limits

Statements relating conversations with defendant which occurred before his marriage to the witness or in the presence of a third party did not violate statutory prohibitions on compelling a spouse to testify. N.C.G.S. § 8-57.

## 4. Witnesses— unavailable—refusal to testify

A witness was not available to testify, and thus his letter was admissible as against his penal interest under N.C.G.S. § 8C-1, Rule 804(b)(3), where he was not ordered to testify but refused to answer questions, was openly hostile to the court, and made clear that the threat of additional prison time made no difference to him since he was serving a term of 106 to 130 years.

## 5. Witnesses— absence not improperly procured—plea bargain—no prohibition on testimony

The State did not improperly procure the absence of a witness within the meaning of N.C.G.S. § 8C-1, Rule 804(a) where there was nothing in the witness's actual plea agreement which prohibited him from testifying, although an initial plea offer contained a provision that the witness would not be required to testify.

## 6. Evidence— hearsay—statement against penal interest

The trial court did not err by finding that letters from an accomplice were an attempt to persuade a witness to lie and that the two-prong test for admissibility under N.C.G.S. § 8C-1, Rule 804(b)(3) for admission against penal interest was satisfied.

**7. Evidence— hearsay—residual exception—letters from accomplice**

Letters from an accomplice who refused to testify were admissible under the residual exception of the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 804(b)(5).

**8. Constitutional Law— confrontation—letters from accomplice—no violation**

Defendant's rights under the Confrontation Clause were not violated by the admission of letters from an accomplice who refused to testify; moreover, admission of the letters was not prejudicial given the substantial evidence of defendant's involvement in the crimes.

**9. Evidence— similar subsequent offenses—chain of circumstances**

The trial court did not abuse its discretion in a prosecution for murder, burglary, robbery, and kidnapping by admitting evidence of defendant's commission of four similar crimes within weeks of the charged offenses. Defendant asserted that the probative value was outweighed by the prejudice, but the court conducted a voir dire and entered an order which detailed the evidence and concluded that the evidence established a chain of circumstances or context and served to enhance the natural development of the facts.

Appeal by defendant from judgments entered 15 June 2000 by Judge Jay D. Hockenbury in New Hanover County Superior Court. Heard in the Court of Appeals 10 February 2003.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Joan M. Cunningham, for the State.*

*Edwin L. West, III, P.L.L.C., by Edwin L. West, III, for defendant-appellant.*

MARTIN, Judge.

Defendant, Shan Carter, was tried upon his pleas of not guilty to bills of indictment charging him with first degree murder, first degree burlgary, second degree kidnapping, and robbery with a dangerous weapon. The State offered evidence tending to show that on 6 December 1996, Donald Brunson lived with his fiancé, Ana Santiago, and her three children, Angel, Brenda, and DeCarlos. During the early

morning hours of 6 December, Santiago heard noises in the house, and before she could waken Brunson, three armed men wearing masks entered their bedroom and ordered them onto the floor. Santiago heard Brunson struggle and the men order him not to look up or look at their faces. Santiago then heard a gunshot. She testified the men began to violently beat Brunson with "hard impact blows." Santiage heard a man in her daughters' bedtoom telling them to go back to sleep. She also heard the men take DeCarlos from his bedroom, followed by the sound of tearing bed sheets. The men tied DeCarlos' hands and feet, laid him next to Santiago on the floor, and covered the two with bed sheets. Santiago could see that Brunson's feet were also tied with torn sheets. Santiago testified she then heard the men pulling Brunson out of the bedroom as he struggled, and she could hear "his fingers just tearing on the door frame" in an attempt to stay in the room. The men took Brunson to DeCarlos' room where they continued to beat him. Santiago heard Brunson "crying for his life" and stating his teeth had been knocked out. When Brunson asked "what this was about," the men responded "[i]t's about you."

Santiago also heard the men demanding jewelry, money, and a gun from Brunson. The men took Brunson's gold watch, Santiago's gold watch, some money, and possibly a gun. Santiago eventually heard the men comment that Brunson was "out" and unconscious. She then heard the men whispering about "get[ting] the keys." After the men left the house and Santiago heard cars leaving, she ran to the telephone, but all the lines had been cut. She looked out the window and saw that her white 1993 Honda was gone. She then searched the house for Brunson, but he was not there. Santiago estimated the men were in her home for approximately 30 minutes to an hour. During the encounter, Santiago observed that one of the men was dressed in a green Army fatigue jacket, blue jeans, and black Timberland boots, and another man wore rust-colored Gore-Tex shoes. Santiago had always assumed Brunson was involved with drugs.

The State also presented the testimony of Nakisha Bowen, who testified that in the early morning hours of 6 December 1996, she and Amber Little were driving around looking for their boyfriends. They saw defendant driving his car at a high rate of speed; Little's boyfriend, Kwada Temoney, was a passenger in defendant's car. Bowen and Little drove to Bowen's house, where defendant had just parked his car and gotten out of the vehicle. Defendant instructed Bowen to get out of her car, and when she refused, he pointed a handgun at her head and stated it "was a life or death situation." Defendant

was acting "hyped up" and was in a hurry. Temoney then removed a bag of clothes which appeared to contain blue jeans and a pair of Timberland boots from the trunk of defendant's car. When Bowen got out of her car, Temoney got into the car with Little. Little testified she noticed a blood stain on Temoney's shirt, and a "really, really strong" burn smell "like something had caught on fire." Temoney instructed Little to drive to an apartment complex where Little saw Temoney throw the bag of clothes and the Timberland boots into a dumpster.

At approximately 6:00 a.m. on the same morning, Santiago's Honda was discovered with its trunk and driver's side door open approximately 7 miles from her home in a wooded area behind a sewage plant. Detective Tim Karp testified he recovered a black hood from just outside the driver's side door, a black ski mask from between the passenger's seat and door, and a face mask from the back seat. DNA extracted from fibers on the ski mask matched that of Temoney. The driver's side floor contained burnt debris and ashes, and testing revealed the presence of blood in various places in the car and trunk.

Later that afternoon, authorities discovered Brunson's body in woods approximately 100 yards from the Honda. Brunson was clothed only in a bloody t-shirt, and a computer cord was tied around his right leg with a Nintendo controller at the other end. A bed sheet, a log with blood on it, and a bullet fragment were recovered near the body. Dr. John Almeida testified Brunson had a "gapping" laceration in his chin caused by a "significant blow" from a blunt object, a broken jaw, several abrasions to his head, several bruises about the back, cuts and other defense wounds to his hand, a bullet wound to his upper right arm, and three gunshot wounds to the back, including two entrance wounds and an exit wound. Dr. Almeida listed the cause of · Brunson's death as a gunshot wound to the back.

The State also called defendant's wife, Keisha Carter ("Keisha"), as a witness at trial. After Keisha invoked the marital privilege, the State was permitted, over defendant's objection, to introduce a videotaped statement which she gave to police officers on 14 October 1999. In the interview, Keisha stated that early on a morning in early December 1996, defendant came to her house crying and told her Temoney had just killed Brunson. Defendant told Keisha he and Temoney had followed Brunson home in order to rob him, waited until Brunson went to bed, then kicked in the door and entered the house. The two tied up Brunson and the others with bed sheets, beat

Brunson, and stole money and drugs from the house. Defendant told Keisha he could not stop Temoney from beating Brunson, and when Brunson used Temoney's name, Temoney told defendant they would have to kill Brunson. When Brunson was rendered unconscious, defendant and Temoney placed him in the trunk of a white Honda parked at Brunson's house. Temoney drove the Honda to a wooded area while defendant followed in his own car. Defendant told Keisha that once they had parked in the woods, Brunson opened the trunk, got out, and started to run. Temoney then shot at Brunson until he fell, approached Brunson, and shot him again. Defendant stated Temoney put Brunson's body back in the Honda and attempted to light the car on fire. Defendant also relayed to Keisha that he and Temoney had encountered Bowen and Little after the killing, and that Little had asked Temoney why he had blood on his shirt.

Keisha told the officers she had overheard defendant and Temoney talk of robbing Brunson about a week prior to the incident. Temoney had used drugs with Brunson before, and the two knew Brunson was involved with drugs and likely had money. Keisha further stated that on the same morning defendant related these events, he repeatedly insisted that she marry him immediately. Keisha assumed defendant was being insistent about marrying because he knew he would be going to prison. The two were married approximately one week later, on 12 December 1996. Additionally, Keisha provided information in the interview about other robberies defendant told her he had committed with Temoney.

The State also introduced letters written to Little by Temoney in June 1997 while he was incarcerated for unrelated murder charges. In the letters, Temoney urged Little to lie about the events of 6 December 1996 and state that she was with Temoney at all relevant times. Temoney directed Little to destroy his letters after reading them and not to discuss them with anyone. Additionally, over defendant's objection, the State was permitted to introduce evidence of four other crimes committed by defendant and Temoney involving robberies and assaults of known drug dealers within weeks of the Brunson murder.

Defendant did not testify, but presented testimony from Keisha, to whom he was still married, that she spoke to authorities on 14 October 1999 because she was afraid she might be arrested, and that the information she gave authorities during that interview was based on what she had "heard on the streets about the case." Keisha testified the statements she gave during the interview were true, but

denied defendant had given her the information, maintaining only that she heard it "on the streets." Keisha also testified that she struggled with depression and had been admitted to two mental health institutions. Keisha's grandfather testified she had been staying at Cherry Hospital around the time she made her statement to law enforcement.

Defendant also presented testimony from Santiago's son, DeCarlos, that he believed there were as many as four or five intruders in his home on 6 December 1996, and that some of the men had "New York City accent[s]."

Defendant was found guilty of all charges and sentenced to consecutive sentences of life imprisonment without parole for first degree murder, a minimum of 103 months and maximum of 133 months for robbery with a dangerous weapon, a minimum of 103 months and maximum of 133 months for first degree burglary, and a concurrent sentence of a minimum of 34 months and maximum of 50 months for second degree kidnapping. Defendant appeals.

Of one hundred and four assignments of error contained in the record on appeal, defendant brings forward fourteen in his brief. The remaining ninety assignments of error are deemed abandoned. *See* N.C.R. App. P. 28(a) (2002).

I.

**[1]** By five assignments of error, defendant asserts he is entitled to a new trial due to the admission of Keisha Carter's 14 October 1999 out-of-court statements to officers with respect to the Brunson crimes and other robberies. He argues the statements constituted unreliable hearsay and the admission thereof violated his constitutional rights to due process and confrontation. The trial court permitted the State to play portions of the videotape of Keisha's interview with police and admitted transcripts of the interview into evidence under G.S. § 8C-1, Rule 804(b)(5). We hold the statements, though hearsay, were admissible under the exception to the rule against hearsay embodied in Rule 804(b)(5), and their admission did not violate defendant's constitutional rights.

"North Carolina Rule of Evidence 804(b) provides for certain exceptions to the hearsay rule when the declarant is determined to be unavailable under North Carolina Rule of Evidence 804(a)." *State v. Williams*, 355 N.C. 501, 535, 565 S.E.2d 609, 629 (2002) *cert. denied,*

—— U.S. ——, 154 L. Ed. 2d 808 (2003). Rule 804(b)(5) provides in pertinent part:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2002). Once the trial court determines the declarant to be unavailable, the court must conduct a six-part inquiry to ascertain whether the hearsay evidence should be admitted under this exception. *Williams*, 355 N.C. at 535-36, 565 S.E.2d at 629-30. This inquiry includes an analysis of the following six factors:

> (1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;
>
> (2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);
>
> (3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";
>
> (4) That the proffered statement is offered as evidence of a material fact;
>
> (5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and
>
> (6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Fowler*, 353 N.C. 599, 609, 548 S.E.2d 684, 693 (2001), *cert. denied*, 535 U.S. 929, 152 L. Ed. 2d 230 (2002) (citation omitted). Moreover, when considering the third factor, whether the evidence possesses equivalent circumstantial guarantees of trustworthiness, the Supreme Court has held that the trial court must examine "(1) the

declarant's personal knowledge of the underlying event, (2) the declarant's motivation to speak the truth, (3) whether the declarant recanted, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *Id.* at 612, 548 S.E.2d at 694.

In the present case, prior to admitting Keisha's videotaped statements, the trial court conducted an extensive two-day *voir dire* hearing, including testimony from Keisha, and entered an "Order on Admissibility." In its order, the court determined Keisha was unavailable as a witness because she had asserted the marital privilege under G.S. § 8-57 not to testify or be compelled to testify against her husband. As a preliminary matter, the court made findings that prior to giving her statements on 14 October 1999, Keisha was told by law enforcement that she was free to leave, was not under arrest, and was not going to be arrested; that her statements were made freely, voluntarily, and willingly without coercion or intimidation by the officers and after she had been informed of the marital privilege; and that Keisha was lucid and coherent during the interview, and she understood and was responsive to questions.

The trial court also systematically analyzed each factor of the required six-prong inquiry, determining that the defense was given proper notice of the State's intent to use Keisha's statements, its particulars, and Keisha's name and address; that the statements were not specifically covered by any other hearsay exception; that the statements possessed circumstantial guarantees of trustworthiness without reference to corroborating evidence; that the statements were evidence of a material fact because they directly established defendant's involvement with the Brunson crimes and other robberies; that the statements were more probative on the issue than any other evidence which the State could reasonably produce given that Keisha was exempt from testifying and there were no other means by which to proffer the evidence; and finally, that the interests of justice would be served by admission of the statements because they were the only direct evidence of defendant's involvement in the crimes.

On the issue of trustworthiness, the trial court made extensive findings of fact, including that the statements contained assurances of personal knowledge. In support of this finding, the trial court noted that Keisha and defendant lived together before they were married; that defendant gave Keisha specific details about the events of 6 December on the same morning they occurred and on the same morning he asked Keisha to marry him; that defendant was highly emotional and crying at the time he gave Keisha the specific details; and

that defendant gave Keisha specific details about the additional rob-
beries shortly after their marriage and close in time to commission of
those crimes. The court also found the evidence trustworthy based on
Keisha's motive to tell the truth. On that factor, the trial court found
that prior to contacting authorities, Keisha told a friend she could no
longer keep to herself the information defendant had told her and
that she desired to inform authorities of what she knew; that Keisha
initiated contact with authorities and voluntarily gave her statements;
that her statements were not casual remarks to disinterested persons,
but were made to authorities whom Keisha knew would investigate
the truth of her statements; that Keisha's statements actually mini-
mized defendant's culpability in the crimes because defendant had
expressed he did not want to help Temoney kill Brunson and Keisha
stated defendant was a good person and had a heart; that Keisha
expressed no anger towards defendant and had no motive to lie; and
that there existed no credible evidence that Keisha intended to falsely
implicate defendant in the crimes.

The trial court also found that Keisha had never recanted the sub-
stance of her statements despite subsequent meetings with law
enforcement officers and an attorney and, in fact, had reiterated the
truth of the information she provided in her statements. The trial
court further found that Keisha rendered her statements of events to
authorities more than once, yet the details of her statements
remained the same; that the fact her statements were given on video-
tape allowed the court to view her demeanor and ascertain credibil-
ity; that her statements were not based on the memory or notes of a
third party; and that the statements were not given in exchange for
leniency or other promises.

We are bound by the trial court's findings of fact as to admissibil-
ity of evidence under Rule 804(b)(5) where such findings are sup-
ported by competent evidence, despite the existence of evidence
from which a different conclusion could have been reached. *State v.
Brown*, 339 N.C. 426, 451 S.E.2d 181 (1994), *cert. denied*, 516 U.S. 825,
133 L. Ed. 2d 46 (1995). In this case, the trial court's findings on
admissibility are supported by ample competent evidence, and these
findings, which conform to the inquiries required of the trial court on
this issue, sufficiently support the trial court's admission of Keisha's
statements under Rule 804(b)(5).

[2] We also hold admission of the evidence did not violate defend-
ant's constitutional rights to due process and confrontation. Our
Supreme Court has adopted the use of a two-part test to determine

whether the admission of hearsay evidence violates the Confrontation Clause: (1) "the prosecution must 'either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use,' " meaning the State has made a good-faith effort to obtain the declarant's presence at trial; and (2) "the statements at issue have sufficient 'indicia of reliability.' " *Fowler*, 353 N.C. at 615, 548 S.E.2d at 696 (citations omitted). Where the hearsay evidence does not fall under a "firmly rooted" exception to the hearsay rule, and Rule 804(b)(5) is not such an exception, the evidence should also not be admitted without "a showing of particularized guarantees of trustworthiness drawn from the totality of the circumstances surrounding the statements." *Id.* However, the Supreme Court has recognized that these inquiries are encompassed within the six-prong test for admissibility set forth above. *Id.* Thus, where an analysis of the factors considered in reviewing admissibility under Rule 804(b)(5) sufficiently supports admission of the evidence, the analysis simultaneously demonstrates that its admission would not violate the Confrontation Clause. *Id.* at 615, 548 S.E.2d at 697.

Nevertheless, our Supreme Court has also recognized that " 'courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the [Confrontation] Clause.' " *Id.* at 616, 548 S.E.2d at 697 (citation omitted). Accordingly, we have independently reviewed defendant's claim under the Confrontation Clause and conclude that admission of Keisha's statements did not violate defendant's constitutional rights. The State amply demonstrated Keisha's unavailability as a witness due to her assertion of the marital privilege. Moreover, the trial court entered extensive findings, as noted above, on the reliability and trustworthiness of the statements. Those findings indicate that Keisha made her statements voluntarily without coercion or promises; that she did so without motive to lie or wrongly implicate defendant; that her statements minimized defendant's culpability in the crimes; that defendant loved and trusted Keisha at the time he related his involvement in the crimes, and was emotional while doing so; that defendant related specific details about the manner in which the crimes were committed shortly after their commission; that Keisha had not recanted her statements but had re-emphasized the truth of their substance; and that the substance of Keisha's statements remained consistent despite her multiple renditions to law enforcement officers. These findings are supported by the evidence and amply support a determination that the statements possessed

the requisite indicia of reliability and particularized guarantees of trustworthiness sufficient for admission under the applicable two-prong test.

In any event, Keisha later waived her privilege not to testify and was called by the defense as a witness. Defendant therefore had every opportunity to confront Keisha at trial regarding her statements to the authorities on 14 October 1999 and, indeed, did confront her on these issues, eliciting her testimony that defendant did not tell her the information she shared with authorities and that she had been both angry at defendant and suffering from depression around the time she made the statements. These assignments of error are therefore overruled.

## II.

[3] Defendant next argues the trial court erred in admitting Keisha's out-of-court statements to authorities because the admission amounted to compelled testimony in violation of the marital privilege contained in G.S. § 8-57. Under that statute, in a criminal action, "[n]o husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other *during their marriage.*" N.C. Gen. Stat. § 8-57(c) (2002) (emphasis added).

Under the plain language of G.S. § 8-57, the privilege extends only to communications between spouses during the marriage. Defendant and Keisha were not married on 6 December 1996 when defendant told Keisha about the Brunson crimes. Therefore, Keisha's statements to authorities regarding her conversation with defendant on 6 December are not covered by G.S. § 8-57. The trial court made findings to this effect which were supported by the evidence.

During her interview with authorities, Keisha also relayed information about defendant's involvement in crimes against Tyrone Baker, Louis Tyson, and Keith Richardson. Defendant's statements to Keisha about the Baker robbery were made prior to their marriage, and thus, the privilege does not apply. At the time defendant told Keisha about the Tyson and Richardson crimes, he and Keisha were married. The trial court accordingly excluded Keisha's statements as to the Richardson robbery. However, as to the Tyson robbery and shooting, the trial court found, and the record supports, that defendant made statements to Keisha about that incident in the presence of a third party. "The [marital] privilege is waived in criminal cases where the conversation is overheard by a third person." *State v.*

*Harvell,* 45 N.C. App. 243, 249, 262 S.E.2d 850, 854 (1980). The admission of Keisha's statements therefore did not violate G.S. § 8-57.

## III.

**[4]** Third, defendant contends the trial court erred in admitting into evidence letters Temoney had written to Little urging her to lie about the events of 6 December 1996. As with Keisha Carter's statements, defendant maintains Temoney's letters were inadmissible hearsay and violated his constitutional rights under the Confrontation Clause. The trial court conducted a *voir dire* hearing on the issue and then entered an "Order on Admissibility" admitting the letters under Rule 804(b)(3), or in the alternative, Rule 804(b)(5).

Rule 804(b)(3) provides an exception to the rule against hearsay for statements against interest where the declarant is unavailable:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.

N.C. Gen. Stat. § 8C-1, Rule 804(b)(3) (2002). Our courts have interpreted this rule as requiring a two-prong inquiry into whether (1) the statement was against the declarant's penal interest; and (2) the court is satisfied that corroborating circumstances indicate the trustworthiness of the statement. *State v. Wardrett,* 145 N.C. App. 409, 414, 551 S.E.2d 214, 218 (2001). "The corroborating circumstances . . . may include other evidence presented at trial." *State v. Kimble,* 140 N.C. App. 153, 157, 535 S.E.2d 882, 885-86 (2000).

In the present case, the trial court first determined Temoney was unavailable as a witness. Defendant takes issue with this determination, arguing the trial court never officially ordered Temoney to testify. Rule 804 provides that a witness may be deemed unavailable where the witness "[p]ersists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." N.C. Gen. Stat. § 8C-1, Rule 804(a)(2) (2002).

However, the trial court found, and the transcript of *voir dire* testimony supports, that Temoney refused to answer questions, was

STATE v. CARTER

[156 N.C. App. 446 (2003)]

openly hostile to the court, and repeatedly made clear that the threat of being given additional prison time for his refusal to testify made no difference to him. Temoney repeatedly stated, "I'm not here to testify . . . so you can go ahead and ship me back up the road that I came from." Temoney informed the trial court that he did not have to testify and that "ya'll don't control me." When threatened with being held in contempt of court for his refusal, Temoney stated, "Man, find me in contempt? I got 106 to 130 years. You think I care if you hold me in contempt of court?" The evidence supports the trial court's finding that "though the court did not specifically order Temoney to testify because it would have been futile to do so[,] Temoney, by his conduct and testimony, made it clear that there were no circumstances, including court intervention or order, which would compel him to testify."

**[5]** Defendant also argues the trial court should not have found Temoney unavailable because his absence was improperly procured by the State. Under Rule 804, a declarant is not unavailable if his refusal to testify "is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying." N.C. Gen. Stat. § 8C-1, Rule 804(a) (2002). Defendant asserts Temoney's initial plea offer from the State to avoid the death penalty contained a provision that Temoney would not be required to testify for the State.

The trial court found there was nothing in Temoney's actual plea agreement which prohibited him from testifying for the State, and that the State did not wrongfully procure his refusal to testify. These findings are supported by competent evidence. Neil Weber, Temoney's attorney for the Brunson crimes, testified on *voir dire* that while negotiating a plea with the State, there was at one time a plea provision that Temoney would not be required to testify for the State, but that the State later rejected that provision. Weber testified that despite the State's rejection of that provision, Temoney nevertheless accepted a plea from the State which did not contain any provision that Temoney would not be called to testify in defendant's trial. Accordingly, the trial court's findings are supported by competent evidence, and those findings support a determination that Temoney was unavailable as a witness.

**[6]** As to admitting the evidence under Rule 804(b)(3), the trial court found Temoney's letters were an attempt to persuade Little to lie about seeing defendant and Temoney together on the night Brunson was murdered, and that the letters instructed Little to give authorities

a different version of events. The trial court found that the letters implicate Temoney in the Brunson crimes, show Temoney's fears about being seen with defendant that evening, thereby linking defendant to the crimes, and show Temoney's fears about defendant telling authorities about their involvement in the Brunson crimes. The trial court found as corroborating circumstances that Bowen and Little both testified they saw Temoney and defendant together the night of the crimes; that Keisha's videotaped statements established that defendant told her he and Temoney had seen Bowen and Little on that night; and that Temoney instructed Little to destroy the letters after reading them and to lie if asked about their contents.

Based on these findings, the trial court concluded Temoney had first-hand knowledge of the events of 6 December 1996, that his statements in the letters were such that a reasonable person would not have written them unless their contents were true, that the contents of the letters were against defendant's penal interest at the time he wrote them, and that the letters were sufficiently trustworthy. The trial court's findings were supported by competent evidence, are therefore binding, and are sufficient to satisfy the applicable two-prong test and support the trial court's conclusion of admissibility under 804(b)(3).

[7] We likewise uphold the trial court's determination that the evidence was also admissible under Rule 804(b)(5). The applicable law on admitting evidence under this subsection is fully set forth in Part I of this opinion. The trial court's order establishes that upon finding Temoney unavailable as a witness, it considered and analyzed each of the six factors required for admissibility under this rule. As to circumstantial guarantees of trustworthiness, the trial court again made extensive findings of fact, including that the letters had the assurance of personal knowledge based on the details Temoney set forth in his letters which would have been known only to someone involved in the events. The court also found Temoney had a motive to tell the truth in the letters, given that they were written two years prior to his being charged with the Brunson crimes; that he wrote them to Little, whom he trusted and loved, addressing her as his loving wife, though they were not married; that the letters implicated him in the crimes; and that he understood the damaging nature of the letters as evidenced by his directing Little to destroy the letters and never discuss their contents. The trial court further found Temoney had never recanted the statements made in the letters, and that the letters were not written for government authorities or in the context of interroga-

STATE v. CARTER

[156 N.C. App. 446 (2003)]

tion, but were written freely and voluntarily only for Little, whom defendant trusted. Upon careful review of the record, we hold the trial court's findings are supported by competent evidence, and that its findings, which encompass all necessary inquiries, support its determination that the letters were admissible under Rule 804(b)(5).

[8] Moreover, following the same analysis applied in Part I, we have independently reviewed defendant's claim that admission of the letters violated his rights under the Confrontation Clause. The State amply demonstrated on *voir dire* that Temoney, who refused to testify, was unavailable as a witness. Additionally, the trial court entered extensive findings, as set forth above, on the issue of the letters' reliability and particularized guarantees of trustworthiness. Those findings established the existence of various corroborating circumstances; that it was evident Temoney had first-hand knowledge of the events of 6 December; that Temoney had a motive to tell the truth in the letters; that the letters were written to someone Temoney loved and trusted and he did so voluntarily; that the letters implicated him in the crimes; that Temoney understood the damaging nature of his statements; and that Temoney had not recanted those statements. These findings are sufficient under the applicable two-prong test to support a determination that admission of the letters did not violate defendant's constitutional rights.

In any event, given the substantial evidence admitted on defendant's involvement in the Brunson crimes, defendant cannot meet his burden of establishing that admission of Temoney's letters urging Little to lie about the events of 6 December were so prejudicial that defendant would not have been convicted had the letters not been admitted. *See* N.C. Gen. Stat. § 15A-1443(a) (2002). This argument is overruled.

IV.

[9] Defendant next maintains the trial court erred in admitting under G.S. § 8C-1 Rule 404(b) evidence of four similar crimes committed by defendant within weeks of the Brunson murder. Defendant does not argue that the evidence was too dissimilar or remote to be admissible under Rule 404(b); he simply asserts the probative value of the evidence was outweighed by its prejudice.

Despite a ruling that evidence is admissible under Rule 404(b), "it nevertheless remains subject to the balancing test of Rule 403. . . .

'The responsibility to determine whether the probative value of relevant evidence is outweighed by its tendency to prejudice the defendant is left to the sound discretion of the trial court.' " *State v. Thibodeaux*, 352 N.C. 570, 579, 532 S.E.2d 797, 804 (2000) (citation omitted), *cert. denied*, 531 U.S. 1155, 148 L. Ed. 2d 976 (2001). Evidence probative of the State's case is necessarily prejudicial to the defendant; the proper inquiry is one of degree. *State v. Ward*, 354 N.C. 231, 264, 555 S.E.2d 251, 272 (2001). " ' "Unfair prejudice," as used in Rule 403, means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." ' " *Id.* (citations omitted).

The trial court conducted a *voir dire* hearing on the evidence of the other crimes and entered an extensive "Order on Admissibility." In its order, the court detailed the evidence as to each of the four crimes, all of which happened within weeks of the Brunson murder, and set forth its specific findings of similarity and relevance to the Brunson crimes, including, but not limited to, (1) the victims were known drug dealers; (2) defendant and Temoney were both involved in the commission of the crimes; (3) the crimes occurred around midnight or in the early morning hours and involved forcible entry into the victims' homes; (4) the perpetrators were seeking, and in most cases found and stole, jewelry, money, guns, and drugs, and in one case, a pair of "Gore-Tex Timberline boots" similar to those worn by defendant on the night of Brunson's murder; (5) in two of the cases the occupants of the homes were forced to lie on the floor and were either tied up or covered; (6) in one case the victim's phone lines were cut and his car stolen; (7) in one case the victim was repeatedly asked for money by one intruder while the other severely beat him about the head and he was shot by Temoney; and (8) defendant, who was apprehended at the scene of one of the crimes, was wearing clothing similar to that worn during the Brunson crime.

Based on its findings, the trial court concluded the evidence supported a reasonable inference that defendant committed the Brunson crimes and that it "establishes a chain of circumstances or context of the charged crime and serves to enhance the natural development of the facts and is necessary to complete the story of the charged crime for the jury." The trial court further concluded this probative value of the evidence outweighed its potential prejudice to defendant. We discern no abuse of discretion in this conclusion, and therefore reject defendant's argument on this ground.

In his final argument, defendant maintains, for preservation purposes only, that his indictment was insufficient to charge first degree murder. Defendant concedes our Supreme Court has addressed and rejected identical arguments. *See, e.g., State v. Williams,* 355 N.C. 501, 565 S.E.2d 609 (2002), *cert. denied,* —— U.S. ——, 154 L. Ed. 2d 808 (2003). Accordingly, we likewise reject his argument.

No error.

Chief Judge EAGLES and Judge GEER concur.