STATE OF NORTH CAROLINA v. DAVID EARL SETZER

No. 7925SC293

(Filed 3 July 1979)

1. **Criminal Law § 21 — delay in ruling on pretrial motions — no abuse of discretion**

   The trial court did not abuse its discretion in failing to rule on defendant's twenty-six pretrial motions until the day before the trial where only three months had elapsed since the filing of the first motion, defendant showed no vindictiveness by the district attorney in not bringing the motions on for hearing earlier, and defendant showed no prejudice from the delay in ruling on the motions. G.S. 15A-952(f).

2. **Jury § 3.1 — motion to pay jurors their weekly wages and provide care for dependents**

   The court properly denied defendant's motion that jurors be paid their weekly wages and that funds be provided for the care of their dependents, since G.S. 7A-312 provides that a juror shall receive $8.00 per day, and jury duty is not a form of employment but is a civic responsibility.

3. **Constitutional Law § 31 — refusal to provide experts at State's expense**

   In this prosecution for murder and arson, the trial court did not err in the denial of defendant's motion for funds to employ a criminologist, a fire investigative expert, a psychologist, a psychiatrist, a parole and probation expert, and a lie detector expert, especially since the court ruled that defendant should be provided funds to employ a pathologist to review the autopsy reports and that the use of a fire investigative expert would be considered if more details were provided by defense counsel. G.S. 7A-454.

4. **Criminal Law § 75.9 — volunteered in-custody statement**

   Defendant's incriminating statement to an officer was not the result of custodial interrogation but was volunteered and admissible in evidence where the officer stopped the car in which defendant was riding, arrested defendant for public drunkenness, and locked him in the police car; the officer started walking toward the car where defendant's wife was seated; defendant told the officer he had better watch out how he talked to defendant's wife; and the officer asked, "Why?" and defendant stated, "Because my wife and brother didn't have anything to do with it. I went up there and did it by myself."

**5. Criminal Law § 83— defendant's statement to wife—no violation of husband-wife privilege**

An officer's testimony that he heard defendant tell his wife, "Ruby, I am in real trouble this time,".did not violate the husband-wife privilege of G.S. 8-56.

**6. Bills of Discovery § 6; Criminal Law § 80.1— letters—discovery order—authentication**

A pretrial discovery order requiring the State to provide statements made by defendant was not violated by the State's failure to provide to defendant before trial letters written by defendant to his brother where the letters first came into the State's possession during trial and were then provided to defendant. Furthermore, the letters were sufficiently authenticated for admission in evidence where defendant's brother testified that he received the letters while he and defendant were in jail two cells apart; defendant would call out that he had a letter on the way and who would bring it and the letters came as defendant said they would; the letters were signed with defendant's initials; and he had seen defendant write receipts and bills and it was his opinion that the letters were in defendant's handwriting.

**7. Homicide § 20.1— photographs of bodies of victims**

In this prosecution for arson and murder, photographs of the victims' bodies found in a burned house were properly admitted for the purpose of illustrating testimony.

**8. Criminal Law §§ 96, 102.5, 128.2— improper question by prosecutor—instruction to disregard—denial of mistrial**

In this prosecution for arson and murder, the trial court did not abuse its discretion in refusing to declare a mistrial when the prosecutor violated an order requiring prior approval of the court for any questions relating to any previous fires that had occurred in the proximate vicinity of defendant where the court sustained defendant's objection to the prosecutor's question and instructed the jury not to consider it, and the question was never answered.

**9. Homicide §§ 30.2, 30.3— instructions on voluntary and involuntary manslaughter not required**

In this prosecution for first degree murder by setting fire to the victims' dwelling, the trial court properly refused to instruct the jury on voluntary manslaughter since there was no evidence that the killings were done in the heat of passion or by the misuse of self-defense. Nor did the court err in refusing to instruct on involuntary manslaughter since malice was implied from defendant's act of intentionally setting fire to a building which he knew to be occupied even if he did not intend to kill the occupants but only to frighten them.

APPEAL by defendant from *Ervin, Judge.* Judgment entered 2 November 1978 in Superior Court, CATAWBA County. Heard in the Court of Appeals 14 June 1979.

Defendant was indicted for the first degree murders of Cary Grant Huffman and Calvin Augustus Duncan, and for arson. Over defendant's objection the cases were consolidated for trial.

Defendant's brother Manuel Setzer, who had been charged with the same crimes, testified under a grant of immunity for the State. He testified that at about 9 p.m. on 4 June 1978 defendant asked him to go to Catawba with defendant and his wife. Defendant had been drinking at that time. On the way they stopped to buy more wine, and defendant had several drinks of it on the trip. When they started back from Catawba defendant did not head toward home. Manuel "asked where we were going and he told me that he was going to check on something." Defendant drove on a dirt road, and when they reached a house in a field, defendant got out of the car. "Standing in front of the house, there was a foam rubber mattress in the front yard. . . . [Defendant] tore a piece off it and went around back of the house with it." Manuel did not see him·go into the house. Defendant was gone for five to seven minutes, then "he came back . . . and jumped in the car and said, let's get the hell out of here. . . . He was scared to death but I didn't know what was wrong with him." The car got stuck and it took about five minutes to get it out.

> "[T]hat is when I first saw something on fire from where the house was and where we just came from. . . . I asked David did he set the house on fire and he said yes. . . . I asked what did he do that for and he said to teach them bastards who they're ------ with. I asked then, you mean somebody is in there. David said yes. . . . [H]e said that he had seen them go out through the backyard with a flashlight. I said are you sure. He said yes. I told him that I was going to call the fire department and he said okay."

They stopped at the first house and asked the people there to call the fire department. When they got back to town, the police were pulling cars over and they were stopped.

On cross-examination Manuel testified that he had had two beers on the day of the fire and about four drinks from a bottle of wine that evening. Between 4:30 and 9 p.m. he saw defendant drink a fifth of wine; "David acted like he was not drunk, just a little drunk." After they left for Catawba defendant drank about half of another fifth of wine. By this time he was "pretty well

drunk . . . half drunk." Manuel repeated the details of the evening as he had told them on direct examination.

Officer Pruitt of the Claremont Police testified that on the night of the fire he stopped the car in which defendant and Manuel Setzer were riding as it came toward town on the road from the farmhouse. Defendant had "an odor of alcohol about him and he was staggering and his speech was slurred and his eyes were bloodshot." Officer Pruitt placed defendant under arrest for public drunkenness, advised him of his rights, and locked him in the police car. Pruitt addressed no questions to defendant, and defendant said nothing to the officer concerning his rights. As Pruitt walked back toward the vehicle where defendant's wife was seated, defendant began beating on the patrol car window. Pruitt returned to him and defendant "said that I had better watch out how I talked to his wife." Pruitt asked, "Why?" and defendant answered, "[B]ecause my wife and my brother didn't have anything to do with it. I went up there and did it by myself." Pruitt testified that at that time he did not know to what defendant was referring. Pruitt then brought defendant's wife over to the patrol car, and he heard defendant say to her, "Ruby, I am in real trouble this time."

Asked on voir dire about defendant's reputation, Officer Pruitt testified that "there had been two or three houses on fire or small blazes in the house where [defendant] lived," and that he considered defendant to be a fire bug. He felt that he had probable cause to believe defendant was involved in the fire when he saw him coming down the road from the farmhouse.

Deputy Sheriff Price testified that he found two charred bodies in the burned house. Photographs of the bodies were admitted into evidence over defendant's objection to illustrate Price's testimony. Dr. Page Hudson, who was stipulated to be an expert forensic pathologist, had examined the bodies, and he gave his opinion that the cause of death was carbon monoxide poisoning and thermal burns. The high levels of alcohol (.35 and .43 per cent) present in the bodies could have contributed to the deaths. Marvin Sawyer, an expert in fire investigation and arson detection, testified that he was unable to determine the cause of the fire.

Defendant presented witnesses, but did not testify. He was found guilty of second degree murder in the deaths of Huffman and Duncan, and guilty of unlawful burning. The court arrested judgment on the conviction of unlawful burning, and sentenced defendant to 30-40 years on each count of second degree murder. From the murder convictions defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Thomas H. Davis, Jr., for the State.*

*Tate, Young & Morphis, by Thomas C. Morphis, for defendant appellant.*

ARNOLD, Judge.

**[1]**  Twenty-six pretrial motions were filed by the defendant. The court entered its order on these motions on 23 October 1978, the day before defendant's case was called for trial. Defendant's motion to dismiss for delay in hearing these motions was denied, and he assigns error to this denial, contending that the delay was intended to hinder him in the preparation of his case.

Only three months elapsed between the filing of the first of the motions and the date the court ruled upon all of them. Defendant has shown no vindictiveness on the part of the District Attorney's office in not bringing the motions on for hearing earlier. In addition, G.S. 15A-952(f) provides that "[w]hen a motion is made before trial, the court *in its discretion* may hear the motion before trial, on the date set for arraignment, on the date set for trial before a jury was impaneled, or during trial." (Emphasis added.) Defendant has shown no instances of prejudice which resulted from a lack of earlier hearing on the motions. We find no abuse of the trial court's discretion.

**[2]**  Defendant next assigns error to the denial of three of his pretrial motions. The first of these requested that the jurors and witnesses be paid their weekly wages and that funds be provided for the care of their dependents. Defendant cites no authority for his position, but he makes the ingenious arguments that without such payment qualified jurors with financial difficulties will ask to be excused from jury service, and that those who do serve will be distracted from the trial by "instinctive concerns about their own survival." Even if we were persuaded by defendant's arguments,

we could find no error in the court's ruling on his motion, since G.S. 7A-312 plainly provides that a juror "shall receive eight dollars ($8.00) per day." Where the legislature has spoken, the court is bound. We note further that jury duty is not a form of employment, but a responsibility owed by a citizen to the State. Finally, defendant has made no attempt to show that any actual prejudice resulted from the denial of this motion.

The second motion which is the subject of an assignment of error asked that the jury be prohibited from dispersing during the trial. Defendant argues that this prohibition was necessary to remove the jurors from possible influence by outside sources. He does not allege, however, that any juror actually was influenced by any source outside the courtroom, and we find no merit in this assignment of error.

[3] Defendant also moved for funds to employ experts: a criminologist, a fire investigative expert, a psychologist and psychiatrist, a parole and probation expert, and a lie detector expert. The court ruled

> 14. That the Defendant's Motion for Funds for Expert Witnesses and Investigator is denied insofar as such relates to a criminologist, psychologist, psychiatrist, parole expert, probation expert, lie detector expert and investigator. The Court will allow the Defendant to procure the services of an area pathologist to review the autopsy reports in this case and will consider the use of a fire investigative expert, if more details of said request are made available to said Judge by the counsel for the Defendant.

Defendant apparently provided the court with no further details regarding the use of a fire investigative expert. G.S. 7A-454 leaves the approval of fees for expert witnesses for an indigent within the court's discretion. Defendant has not shown how the lack of any of the requested experts in fact prejudiced his defense. We find no abuse of discretion.

[4] Defendant assigns error to the court's ruling that an incriminating statement made by the defendant was not the result of custodial interrogation, but was a voluntary utterance and so admissible. The uncontradicted testimony of Officer Pruitt was that after stopping the car in which defendant was riding he ar-

rested defendant for public drunkenness, gave him the *Miranda* warnings, and locked him in the police car. Pruitt started walking toward the car where defendant's wife was seated and defendant began kicking and beating on the patrol car. Pruitt returned to him and defendant said Pruitt had better watch out how he talked to defendant's wife. Pruitt asked, "Why?" and defendant responded, "[B]ecause my wife and my brother didn't have anything to do with it. I went up there and did it by myself." At that time Pruitt did not know to what defendant was referring. Pruitt had thought that defendant's first statement was an allegation that Pruitt had a sexual interest in defendant's wife.

We find no merit in defendant's contention that this was a custodial interrogation. Pruitt testified that he did not question defendant after he gave him the *Miranda* warnings. The single question "Why?", in context, cannot reasonably be seen as referring to the fire. We find no error in the admission of defendant's incriminating statement into evidence. *Cf. State v. Miller*, 276 N.C. 681, 174 S.E. 2d 481 (1970), death penalty vacated 408 U.S. 937, 33 L.Ed. 2d 755, 92 S.Ct. 2863, conformed to 281 N.C. 740, 190 S.E. 2d 841 (1972).

[5]  Nor do we find error in the admission of Pruitt's testimony that he heard defendant say to his wife, "Ruby, I am in real trouble this time." Defendant argues that this communication was privileged because it was between husband and wife. However, the marital privilege of G.S. 8-56 says merely that neither spouse shall be compellable to disclose any confidential communication between them during the marriage. The communication here was not confidential, since it was made within the hearing of a third party, and at any rate the privilege refers only to testimony by a *spouse* about the confidential communication. This argument is unavailing.

[6]  The trial court allowed into evidence letters allegedly written by defendant to his brother Manuel. Defendant argues that the State failed to make timely disclosure of the letters to him, and that the letters were not properly authenticated and so were inadmissible. Prior to trial defendant moved for discovery of all statements made by him, and this motion was granted. The State admits that prior to trial the existence of these letters was not disclosed to defendant. However, it appears in the record that the

letters did not come into the State's possession until after the trial had begun. Manuel Setzer testified that he provided the letters to the District Attorney on Thursday, and that the District Attorney had not known about the letters before then. Defendant's counsel, arguing to suppress, indicated to the trial court that he received copies of the letters on Friday. We find no violation of the discovery order.

Further, we find that the letters were sufficiently authenticated. Manuel Setzer testified that while he and defendant were in jail two cells apart they would sometimes communicate by "hollering" and other times by writing letters. Before each of the letters came to Manuel, defendant called out and told Manuel that he had a letter on the way, and who would bring it. The letters came just as defendant said they would, and they were signed with defendant's initials. Manuel had never received letters from defendant before, but he had seen him write receipts and bills, and it was his opinion that the letters were in defendant's handwriting. After this testimony was heard on voir dire, the court found facts and concluded that the letters were sufficiently authenticated. As there is sufficient evidence to support this conclusion, defendant's argument cannot prevail.

[7] Defendant next assigns error to the admission into evidence of photographs of the bodies found in the burned house, asserting that they were prejudicially horrible and gory. The law in North Carolina on this point is well-established, however. "[I]n a prosecution for homicide, photographs showing the condition of the body when found, the location where found and the surrounding conditions at the time the body was found are not rendered incompetent by their portrayal of the gruesome spectacle and horrifying events which the witness testifies they accurately portray." *State v. Atkinson*, 275 N.C. 288, 311, 167 S.E. 2d 241, 255 (1969), *death penalty vacated* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971), on remand 279 N.C. 386, 183 S.E. 2d 106 (1971), later appeal 281 N.C. 152, 187 S.E. 2d 702 (1972), *cert. denied* 409 U.S. 881, 34 L.Ed. 2d 136, 93 S.Ct. 172 (1972); *State v. Stinson*, 297 N.C. 168, 254 S.E. 2d 23 (1979); 4 Strong's N.C. Index 3d, Criminal Law § 43.4 and cases cited therein. Here the photographs were properly authenticated and admitted only for the purpose of illustrating testimony. Defendant does not contest the admission

procedures, but argues, essentially, that we should change the law, making gruesome photographs inadmissible. This we cannot do.

Aerial photographs of the area in which the burned farmhouse was located were admitted into evidence to illustrate the testimony of Manuel Setzer. Defendant argues that these photographs were not properly authenticated, but we find it unnecessary to reach that question. Even assuming that the admission of the photographs was improper, defendant has shown no prejudice, and we find none, which could have resulted from their admission. Manuel had already testified in detail about landmarks in the area of the farmhouse — a section of badly washed-out road, a silo, and the J. C. Penney warehouse, for example — and how they were related to the sequence of events on the night of the fire. We fail to see how having these details pointed out on aerial photographs (which defendant does not argue inaccurately depicted the area) could have prejudiced defendant's position.

[8] Counsel for defendant made a pretrial motion in limine to prevent the State or its witnesses from referring in open court to any other fires that had occurred in the past in the proximate vicinity of the defendant. This motion was granted to the extent that any such questions by the District Attorney were required to be with the prior approval and consent of the court. At trial, defendant called his mother as a witness, and on cross-examination by the District Attorney the following occurred:

Q. Did you live at the O. D. Smith property?

A. Yes sir.

Q. And was that in 1976?

MR. MORPHIS: Objection.

A. Been about three years ago.

Q. And there was a couple of fires there while you lived there?

MR. MORPHIS: Objection.

COURT: Sustained.

MR. MORPHIS: May we be heard out of the hearing of the jury?

COURT: Objection is sustained. Motion to strike is allowed. Don't consider that question for any purpose, members of the jury.

At this point, out of the hearing of the jury, defendant moved for a mistrial, which was denied. However, the court continued:

[T]he court is of the opinion that it is a violation of the court order and I don't want to hear any more questions of that kind asked of anybody unless you do what I told you to do and that is to call it to the court's attention beforehand and ask the permission of the court to do so. If it does happen again, I am going to grant a mistrial on my own motion.

Defendant contends that the denial of a mistrial was prejudicial error.

We cannot say that the trial court abused its discretion in denying a mistrial. The defendant's objection was sustained and the question was never answered. The motion to strike was allowed and the jury was instructed not to consider the question for any purpose. There was other evidence to support the jury's verdict. The situation is much like that in *State v. Harris*, 22 N.C. App. 332, 206 S.E. 2d 369 (1974), where we observed that the trial court is in the best position to determine the impact of an improper question upon the trial. We uphold the trial court's ruling on the motion.

[9] Finally, defendant contends that the trial court erred in denying his request to charge the jury on voluntary and involuntary manslaughter. We find no evidence to support a charge of voluntary manslaughter, since that verdict must be supported by a showing that the killing was done in the heat of passion or by the mis-use of self-defense, *State v. Wilkerson*, 295 N.C. 559, 579, 247 S.E. 2d 905, 916 (1978), neither of which is present here.

We find, further, that the evidence would not support a charge on involuntary manslaughter. From the evidence presented the jury could find that defendant, while intending to set fire to the farmhouse, did not intend to kill its inhabitants, but only to frighten them. However, the evidence is uncontradicted that defendant knew the house was inhabited. Involuntary manslaughter differs from second degree murder, of which defendant was convicted, in that malice is present in the latter but

not the former. *Id* at 578, 247 S.E. 2d at 916. And malice " ' "does not necessarily mean an actual intent to take human life; it may be . . . implied . . . when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life." [cite omitted.]' " *Id.*, quoting *State v. Wrenn*, 279 N.C. 676, 686-87, 185 S.E. 2d 129, 135 (1971) (Justice, now Chief Justice, Sharp, dissenting). We believe that the act of intentionally setting fire to a building known to be occupied is such an act. Thus, because malice is implied from the nature of the act, an instruction on involuntary manslaughter would have been improper.

We have considered defendant's other assignments of error and we find that they are without merit. In defendant's trial we find

No error.

Judges HEDRICK and VAUGHN concur.