STATE OF NORTH CAROLINA v. MICKEY VONRICE ROLLINS

No. COA07-380

(Filed 18 March 2008)

**1. Evidence— marital privilege—prison visit**

The trial court erred by denying defendant's motion to suppress statements he made to his wife in a prison visiting room which were both recorded and related by her. The marital privilege is not defeated simply because the conversation took place in a prison visiting area.

**2. Confessions and Incriminating Statements— Correction officer transporting defendant—steering topic to incrimination subject**

The trial court erred by denying defendant's motion to suppress an incriminating statement made by defendant to a Correction officer who was transporting him to another facility. The officer steered the conversation to a topic likely to elicit an incriminating response without Miranda warnings.

Appeal by Defendant from order on Defendant's motions to suppress entered 19 August 2005 by Judge William C. Griffin, Jr. and from judgment dated 6 October 2006 by Judge Jack W. Jenkins in Superior Court, Martin County. Heard in the Court of Appeals 14 November 2007.

*Attorney General Roy Cooper, by Special Attorney General Robert C. Montgomery, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Barbara S. Blackman, for Defendant-Appellant.*

McGEE, Judge.

Mickey Vonrice Rollins (Defendant) appeals from the denial of his motions to suppress and from judgment convicting him of first-degree murder. For the reasons set forth below, we reverse the denial of Defendant's motions to suppress and remand the case for a new trial.

Defendant was indicted on charges of first-degree murder, first-degree kidnapping, robbery with a dangerous weapon, and breaking or entering on 2 February 2004. Defendant filed a motion to suppress on 13 September 2004, and filed an affidavit in support of that motion on 15 September 2004. Defendant sought to suppress all statements he had made to his wife, Tolvi Rollins (Mrs. Rollins), on several grounds, including "on the grounds that the statements . . . constitute confidential marital communications under N.C. Gen. Stat. § 8-57(c)." Defendant filed a separate motion to suppress and an affidavit in support of that motion on 20 June 2005. By that motion, Defendant sought to suppress any statements he had made to Officer Timothy Troball (Officer Troball) while Defendant was in custody.

The trial court entered an order denying Defendant's motions to suppress on 19 August 2005. The trial court made the following uncontested findings of fact:

1. On June 11, 2002, Harriet Brown Roberson Highsmith was murdered in her home in Robersonville, Martin County, North Carolina. A number of suspects were initially identified, including . . . [D]efendant. On February 2, 2004, [D]efendant was indicted by the grand jury in Martin County on the charges of Murder, 1st Degree Kidnapping, Robbery with a Dangerous Weapon, and Felony Breaking and Entering.

2. [Mrs.] Rollins and [D]efendant were married on June 25, 2001, in Martin County. On the day prior to the murder, [Mrs.] Rollins and [D]efendant argued. As a result, [D]efendant spent the night in a truck at his aunt's house in Robersonville, which was located across the street from the home of Mrs. Highsmith.

3. In March, 2003, [Mrs.] Rollins and [D]efendant were spending the night at the home of [Mrs.] Rollins' grandmother. While in bed, [D]efendant told his wife he had something very important to tell her, and he would kill her or someone close to her if she ever told anyone. . . . [D]efendant then proceeded to admit to his wife that he had killed Mrs. Highsmith, and provided specific details of same.

4. In June, 2003, [D]efendant began serving a sentence in the North Carolina Department of Correction for a robbery conviction. On or about October 13, 2003, [Mrs.] Rollins disclosed to Robersonville Chief of Police Daryl Knox that her husband, . . . [D]efendant, had confessed to her that he had killed Mrs. Highsmith. The following day, [Mrs.] Rollins relayed this information to Special Agent Walter Brown of the North Carolina State Bureau of Investigation (SBI).

5. On or about October 19, 2003, [Mrs.] Rollins visited [D]efendant at Franklin Correctional facility with the aid of a recording device provided by the SBI. However, poor acoustics made the tape inaudible. On the other hand, [Mrs.] Rollins indicated that . . . [D]efendant again discussed details of the Highsmith murder, and [Mrs.] Rollins relayed this information to the SBI following her visit on October 19, 2003.

6. [Mrs.] Rollins again visited . . . [D]efendant at Dan River Correctional on November 2 and 9, 2003. No recording device was used.

7. On November 23 and 30, 2003, [Mrs.] Rollins visited . . . [D]efendant at Carteret Correctional facility with the aid of a recording device. These recordings are audible. During these two visits, [Mrs.] Rollins and . . . [D]efendant discussed the Highsmith murder, and . . . [D]efendant made admissions as to committing the murder.

8. During these visits at the prison, [Mrs.] Rollins and . . . [D]efendant met in the visiting areas, where other inmates and visitors were located.

9. On or about December 15, 2003, Department of Correction officer Timothy Troball along with fellow officer Gary Conley transported [D]efendant from Carteret Correctional to Pamlico Correctional because [D]efendant's custody level had been elevated. [Officer] Troball had not received any formal law enforcement training as to interrogation or investigative techniques. [Officer] Troball had worked with the "road crew" at the prison for approximately five years, and had never issued "Miranda" warnings to anyone. [Officer] Troball was not a certified law enforcement officer.

10. On said date, during the drive to Pamlico Correctional, [D]efendant began asking questions about North Carolina law. In making conversation, [Officer] Troball asked . . . [D]efendant whatever happened to the other person that was supposedly with him during the Highsmith murder, at which . . . [D]efendant responded that he was killed mafia style, or something to that effect.

Based upon the findings of fact, the trial court made the following conclusions of law:

1. . . . [D]efendant's statements to his wife, [Mrs.] Rollins, while . . . [D]efendant was incarcerated within the North Carolina Department of Correction, lack the requisite expectation of confidentiality, and therefore are not considered confidential marital communications under N.C.G.S. 8-57. See U.S. v. Madoch, 149 F.[3d] 596 (7th Cir. 1998); [United States] v. Harrelson, 754 F.2d [1153] (5th Cir. 1985).

2. . . . [O]fficer Troball engaged in conversation with [D]efendant while transporting him to another correctional facility, and thus, did not formally interrogate . . . [D]efendant.

3. As to the communications between . . . [D]efendant and [Mrs.] Rollins while in bed in March, 2003, the Court defers this ruling to the trial judge, who may treat [D]efendant's motion to suppress those statements as a Motion in Limine.

Defendant subsequently entered an *Alford* plea to the charge of first-degree murder, reserving his right to appeal the denial of his motions to suppress under N.C. Gen. Stat. § 15A-979(b). Pursuant to the plea arrangement, the State dismissed the charges of first-degree kidnapping, robbery with a dangerous weapon, and breaking or enter-

ing. The trial court sentenced Defendant to a term of life in prison without the possibility of parole. Defendant appeals.

I.

**[1]** Defendant argues the trial court erred by denying his motion to suppress statements made to his wife, Mrs. Rollins. Specifically, Defendant argues the trial court erred by concluding that Defendant's statements to Mrs. Rollins, made while Defendant was incarcerated, lacked the requisite expectation of privacy and were not confidential marital communications. Defendant argues that the challenged statements should have been excluded under N.C. Gen. Stat. § 8-57(c), which provides: "No husband or wife shall be compellable in any event to disclose any confidential communication made by one to the other during their marriage." N.C. Gen. Stat. § 8-57(c) (2007).

> Our standard of review of an order granting or denying a motion to suppress is "strictly limited to determining whether the trial [court's] underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the [trial court's] ultimate conclusions of law."

*State v. Ortez*, 178 N.C. App. 236, 243-44, 631 S.E.2d 188, 194-95 (2006) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)), *disc. review denied*, 361 N.C. 434, 649 S.E.2d 642 (2007). "However, the trial court's conclusions of law are fully reviewable on appeal. At a suppression hearing, conflicts in the evidence are to be resolved by the trial court. The trial court must make findings of fact resolving any material conflict in the evidence." *State v. McArn*, 159 N.C. App. 209, 212, 582 S.E.2d 371, 374 (2003) (citations omitted).

Defendant argues the trial court "failed to make any factual findings as to the circumstances in which these conversations occurred." However, where a trial court makes insufficient findings of fact to support its conclusions of law, we may review testimony produced at the hearing that is not refuted to determine whether the conclusions of law were supported. *See State v. Tate*, 58 N.C. App. 494, 499, 294 S.E.2d 16, 19, *disc. review denied*, 306 N.C. 750, 295 S.E.2d 763 (1982), *aff'd per curiam*, 307 N.C. 464, 298 S.E.2d 386 (1983). In *Tate*, the defendant argued that the trial court made insufficient findings of fact to support its conclusions of law in the order denying the defendant's motion to suppress. *Id.* Our Court recognized:

> "If there is no material conflict in the evidence on voir dire, it is not error to admit the challenged evidence without making spe-

cific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. (Citations omitted.) In that event, the necessary findings are implied from the admission of the challenged evidence. (Citation omitted.)"

*Id.* (quoting *State v. Phillips*, 300 N.C. 678, 685, 268 S.E.2d 452, 457 (1980)). In *Tate*, the defendants failed to refute the detective's testimony, and our Court held that the detective's un-refuted testimony supported the trial court's conclusion of law. *Id.* Accordingly, our Court held that the trial court did not err by denying the defendant's motion to suppress. *Id.* Likewise, in the present case, we may review the un-refuted testimony presented at the hearing to determine whether the trial court's conclusions of law were supported.

"[O]ur Supreme Court has interpreted section 8-57 to mean that . . . 'spouses shall be incompetent to testify against one another in a criminal proceeding *only if the substance of the testimony concerns a* "confidential communication" between the marriage partners made during the duration of their marriage[.]' " *State v. Hammonds*, 141 N.C. App. 152, 169-70, 541 S.E.2d 166, 179 (2000) (quoting *State v. Freeman*, 302 N.C. 591, 596, 276 S.E.2d 450, 453 (1981)), *disc. review denied*, 353 N.C. 529, 549 S.E.2d 860, *aff'd per curiam*, 354 N.C. 353, 554 S.E.2d 645 (2001), *cert. denied*, 536 U.S. 907, 153 L. Ed. 2d 184 (2002).

> This holding allows marriage partners to speak freely to each other in confidence without fear of being thereafter confronted with the confession in litigation. However, by confining the spousal disqualification to testimony involving "confidential communications" within the marriage, we prohibit the accused spouse from employing the common law rule solely to inhibit the administration of justice.

*Freeman*, 302 N.C. at 596, 276 S.E.2d at 453-54. "[T]he determination of whether a communication is 'confidential' within the meaning of the statute depends on whether the communication 'was induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship.' " *Hammonds*, 141 N.C. App. at 170, 541 S.E.2d at 179 (quoting *Freeman*, 302 N.C. at 598, 276 S.E.2d at 454 (citations omitted)).

In the present case, it is uncontested that Defendant and Mrs. Rollins were married at all relevant times. Mrs. Rollins testified that

when she visited Defendant at the Franklin Correctional facility, she was affectionate toward him, kissed him, and brought him food. Mrs. Rollins testified that Defendant trusted her and that she let him know that she trusted him. She also testified that she encouraged Defendant to confide in her and promised to return and see him regularly. Mrs. Rollins testified that when she visited Defendant at the Dan River Correctional facility on 2 November 2003, she "loved on him," promised Defendant that she would be there for him when he got out of prison, and promised she would never tell anyone about what Defendant confided in her regarding the death of Ms. Highsmith. Mrs. Rollins further testified that when she visited Defendant on 19 November 2003, she "loved on [Defendant]" again, and brought Defendant a pecan pie. Mrs. Rollins also testified that when she visited Defendant at the Carteret County Correctional facility, she told him she would be there for him and that she was going to have children with him when he got out of prison. Accordingly, it is clear that the statements Defendant made to Mrs. Rollins during these visits were " 'induced by the marital relationship and prompted by the affection, confidence, and loyalty engendered by such relationship.' " *Hammonds*, 141 N.C. App. at 170, 541 S.E.2d at 179 (quoting *Freeman*, 302 N.C. at 598, 276 S.E.2d at 454 (citations omitted)).

Nevertheless, the State contends, and the trial court concluded, that because the conversations took place in prison, the conversations lacked the requisite expectation of confidentiality. The State argues that "the spousal privilege is destroyed by the mere possibility that a conversation may be overheard due to the public setting in which the statements are made." We disagree.

Our Court recently recognized that "[b]ecause of the requirement of confidentiality, it is well established that the marital privilege does not apply to communications made within the known hearing of a third party." *State v. Kirby*, 187 N.C. App. 367, 372, 653 S.E.2d 174, 178 (2007). In support of that proposition, our Court cited the following cases: *State v. Gladden*, 168 N.C. App. 548, 608 S.E.2d 93, *disc. review denied*, 359 N.C. 638, 614 S.E.2d 312 (2005); *State v. Carter*, 156 N.C. App. 446, 577 S.E.2d 640 (2003), *cert. denied*, 358 N.C. 547 (2004), *cert. denied*, 543 U.S. 1058, 160 L. Ed. 2d 784 (2005); and *State v. Setzer*, 42 N.C. App. 98, 256 S.E.2d 485, *disc. review denied*, 298 N.C. 571, 261 S.E.2d 127 (1979). However, for the reasons that follow, *Kirby*, *Gladden*, *Carter*, and *Setzer* are distinguishable from the present case.

In *Kirby*, the defendant's wife testified that she was in her bedroom while the defendant and two other men were in the adjacent living room. *Id.* at 369, 653 S.E.2d at 176. The defendant " 'flung' open the bedroom door and, standing just inside the opened door, 'yell[ed]' to [his wife], 'Get up, I think I've killed him.' " *Id.* at 369, 653 S.E.2d at 176. The defendant argued the trial court erred by admitting his statement to his wife in violation of the marital privilege. *Id.* at 369, 653 S.E.2d at 177. However, the defendant's wife testified that the defendant spoke in a loud voice and could have been heard by someone in the living room. *Id.* at 372-73, 653 S.E.2d at 178. Moreover, another person was in the living room at the time, and that person was in a position to have heard the defendant's statement. *Id.* at 372-73, 653 S.E.2d at 178. Our Court held:

> Although [the] defendant states that "it is clear that [he] intended to speak to his wife in confidence," we find this assertion untenable in light of the evidence that [the] defendant "yell[ed]" or "hollered" the statement while standing in the bedroom's open doorway right next to the living room. [The] [d]efendant's volume in conjunction with his undisputed knowledge that [a third person] was within easy hearing distance establishes a lack of confidentiality that supports the trial court's determination that the communication was not privileged.

*Id.* at 372-73, 653 S.E.2d at 178.

In contrast, in the present case, Mrs. Rollins testified during cross-examination regarding her conversation with Defendant at the Franklin Correctional facility on 19 October 2003 as follows:

> Q. When you discussed those details [of Ms. Highsmith's murder] with [Defendant], it was done in confidence between you and him; there wasn't anybody else listening as far as you knew. Isn't that right?
>
> A. Correct.

Mrs. Rollins also testified as follows:

> Q. And, when [Defendant] confided details to you at Dan River on November the 2nd, 2003, that was done in confidence, wasn't it?
>
> A. Yes.

Q. And there was nobody else listening. When he talked to you, it was done in direct conversation with you with an effort to not let anybody else hear.

A. Correct.

Mrs. Rollins further testified:

Q. And, when [Defendant] spoke to you on the 23rd [of November, 2003] at Carteret County Correctional, he spoke to you in confidence, didn't he?

A. Yes, he did.

Q. Nobody else could hear; isn't that right?

A. (Nods affirmatively.)

. . .

Q. The conversation[s] between you and [Defendant] on November the 30th at the Carteret Correctional Institute, they were done in confidence; nobody else heard them; they were done exclusively so that only you and [Defendant] could hear the conversation.

A. Yes.

Examining all of the circumstances surrounding Defendant's statements to Mrs. Rollins, it is clear that Defendant and Mrs. Rollins intended to keep their conversations private. In fact, they succeeded in keeping their conversations private. Moreover, Mrs. Rollins' disclosure of Defendant's confidential communications cannot destroy Defendant's right to assert the marital privilege. In *Hicks v. Hicks*, 271 N.C. 204, 155 S.E.2d 799 (1967), a husband surreptitiously made a tape recording of a conversation between him and his wife in the basement of their home and in the presence of their eight-year-old child, and the trial court admitted the evidence. *Id.* at 205, 155 S.E.2d at 800. Our Supreme Court held that the presence of the child did not destroy the confidentiality of the conversation and that the trial court erred by admitting the evidence, recognizing that the husband could not unilaterally destroy the wife's privilege to exclude the evidence. *Id.* at 205-08, 155 S.E.2d at 800-02. Likewise, the marital privilege in the present case was not defeated when Mrs. Rollins revealed the confidential communications by making tape recordings of such communications and providing them to law enforcement. *See id.*; *see also McCoy v. Justice*, 199 N.C. 602, 155 S.E. 452 (1930) (holding that one

spouse cannot defeat the other spouse's privilege to exclude evidence by disclosing a confidential marital communication to a third party).

*Gladden* is equally distinguishable from the present case. In *Gladden,* the defendant argued the trial court erred by admitting a transcript and tape recording of a phone conversation "between [the] defendant, his wife, and his step-daughter[]" while the defendant was in jail. *Gladden,* 168 N.C. App. at 550-52, 608 S.E.2d at 95-96. Our Court held that the marital privilege was defeated by the step-daughter's active participation in the conversation. *Id.* at 552-53, 608 S.E.2d at 96. We also held: "[The] defendant was informed prior to making the phone call that all calls made to outside parties were subject to recording and monitoring. Under these circumstances, the conversation between [the] defendant and his wife was not confidential." *Id.* at 553, 608 S.E.2d at 96.

In the present case, no third person was involved in the conversations between Defendant and Mrs. Rollins. Moreover, the conversations between Defendant and Mrs. Rollins were not intercepted by the recording devices of the correctional facilities in which Defendant was housed. Unlike in *Gladden,* Defendant's statements were intercepted by a recording device worn by Mrs. Rollins and Defendant was certainly never warned about the possible recording or monitoring of his conversations with his wife.

In *Carter,* our Court recognized that " '[t]he [marital] privilege is waived in criminal cases where the conversation is overheard by a third person.' " *Carter,* 156 N.C. App. at 457-58, 577 S.E.2d at 647 (quoting *State v. Harvell,* 45 N.C. App. 243, 249, 262 S.E.2d 850, 854, *disc. review denied,* 300 N.C. 200, 269 S.E.2d 626 (1980)). In *Setzer,* the defendant argued the trial court erred by admitting an officer's testimony regarding a statement he heard the defendant make to the defendant's wife. *Setzer,* 42 N.C. App. at 104, 256 S.E.2d at 489. However, our Court held that the "communication . . . was not confidential, since it was made within the hearing of a third party[.]" *Id.* In the present case, unlike in *Carter* and *Setzer,* it is uncontested that Defendant's statements were not overheard by a third person. In fact, the State concedes in its brief that "[t]here was no evidence presented that any person actually overheard [D]efendant's statements to his wife while in the visiting areas."

In support of its conclusion of law in the present case, the trial court cited *U.S. v. Madoch,* 149 F.3d 596 (7th Cir. 1998), and *United States v. Harrelson,* 754 F.2d 1153 (5th Cir. 1985), *reh'g*

*denied,* 766 F.2d 186 (5th Cir. 1985), *cert. denied,* 474 U.S. 908, 88 L. Ed. 2d 241, *cert. denied,* 474 U.S. 1034, 88 L. Ed. 2d 578 (1985). However, these cases are also distinguishable. In *Madoch,* the defendant was convicted of conspiracy to defraud the government; of making false, fictitious or fraudulent claims; and of concealment of assets. *Madoch,* 149 F.3d at 598. The defendant argued the trial court erred by admitting a tape recording of a telephone conversation between the defendant and her husband while her husband was in jail. *Id.* at 602. However, the defendant knew her husband was in jail when she spoke with him. *Id.* The Seventh Circuit held as to the telephone conversation:

> Thus, because the marital communications privilege protects only communications made in confidence, . . . under the unusual circumstances where the spouse seeking to invoke the communications privilege knows that the other spouse is incarcerated, and bearing in mind the well-known need for correctional institutions to monitor inmate conversations, we agree with the district court that any privilege [the defendant] and [her husband] might ordinarily have enjoyed did not apply.

*Id.*

*Madoch* is similar to *Gladden,* where the defendant, who was in prison, was informed prior to making a telephone call that telephone calls from prison were subject to recording and monitoring. *Gladden,* 168 N.C. App. at 553, 608 S.E.2d at 96. Both cases recognize the legitimate need for prisons to monitor the communications of their inmates. *See also Lanza v. New York,* 370 U.S. 139, 143, 8 L. Ed. 2d 384, 388 (1962) (recognizing: "In prison, official surveillance has traditionally been the order of the day."). However, the conversations at issue in the present case were not intercepted by the correctional facilities' own surveillance systems; rather, the conversations were intercepted only because outside law enforcement placed a recording device on Defendant's wife. While an inmate should know that his conversations in prison might be overheard by recording devices placed on the walls or in the telephones, an inmate cannot reasonably expect a spouse, who acts as such, as Mrs. Rollins did in the present case, to be wearing a recording device. Moreover, because the surveillance in the present case was entirely unrelated to the traditional need for surveillance in prisons, the interception of the communication by law enforcement cannot defeat the marital privilege where Defendant and Mrs. Rollins attempted to keep their communications from being overheard by third parties, and succeeded in doing so.

In *Harrelson,* the defendants, who were married, argued the trial court erred by admitting a tape recording of their conversation made while one of them was visiting the other in jail. *Harrelson,* 754 F.2d at 1169. Their conversation was recorded by an inmate in the next cell who used a tape recorder provided by the Federal Bureau of Investigation. *Id.* The defendants argued the conversation was inadmissible under a statute that prohibited the interception of oral communications under certain circumstances. *Id.* However, the government countered that the defendants' conversation was not an "oral communication" within the meaning of the statute. *Id.* In order to determine whether the challenged conversation constituted an oral communication, the Fifth Circuit had to determine whether the defendants had a reasonable expectation of privacy as they spoke to one another in jail. *Id.* The Fifth Circuit held:

> The answer must be that they did not. It is unnecessary to consult the case law to conclude that one who expects privacy under the circumstances of prison visiting is, if not actually foolish, exceptionally naive; Harrelson, highly intelligent and no neophyte at prison life, was neither. The evidence indicates as much; the precautions taken to prevent eavesdropping show the Harrelsons to have been aware of the possibility of it.

*Id.*

In the present case, unlike in *Harrelson,* the conversations between Defendant and Mrs. Rollins were not overheard by a third person. We fully recognize that inmates generally have a lessened expectation of privacy; however, we do not agree with the State's contention in this case that an inmate cannot have a private conversation with his or her spouse simply because the inmate is in prison. As we recognized above, the lessened expectation of privacy in prison is a necessary result of the need for prison security. As a result, inmates are aware that there may be listening devices in the telephones or on the walls and that conversations may be overheard by other inmates. However, in the present case, the conversations between Defendant and Mrs. Rollins were not overheard by a third party and were only obtained through Mrs. Rollins' participation.

In *Taylor v. State,* 855 So.2d 1 (Fla. 2003), *cert. denied,* 541 U.S. 905, 158 L. Ed. 2d 248 (2004), the Florida Supreme Court rejected an argument similar to the one the State makes in the present case, noting the following:

The State also argues that Taylor waived the marital privilege because the conversation in question took place at the jail and therefore Taylor did not have a reasonable expectation of privacy. *See, e.g., Proffitt v. State*, 315 So.2d 461, 465 (Fla. 1975), *aff'd*, 428 U.S. 242, . . . 49 L. Ed. 2d 913 (1976); *Johnson v. State*, 730 So.2d 368, 370 (Fla. 5th DCA 1999). However, the cases cited by the State in support of this proposition involve situations where otherwise privileged conversations were taped or overheard by third parties. As a general rule, when third party eavesdroppers hear otherwise privileged communications, the communications are not privileged unless the communicating parties had a reasonable expectation of privacy. *See* § 90.507 Fla. Stat. (1999); *see also* Charles W. Ehrhardt, *Florida Evidence* § 507.2 (2001 ed.). In the instant case, however, there was no third party involved, no one overheard the conversation, and the trial court required Mrs. Taylor to directly testify as to the privileged conversation.

*Id.* at 27 n.30.

In the present case, as in *Taylor*, no third party was involved and no one overheard the conversations between Defendant and Mrs. Rollins. Similar to *Taylor*, the State obtained the tape recordings in the present case only by the direct participation of Mrs. Rollins.

For the reasons stated above, we hold that where, as a result of the marital relationship, one spouse induces the other to make statements and the parties attempt to keep their conversation private, and the conversation is not in fact overheard, the marital privilege is not defeated simply because the conversation took place in a prison visiting area. The trial court's conclusion of law was thus erroneous and was not supported by the evidence or the findings of fact. We hold that the trial court erred by denying Defendant's motion to suppress and therefore Defendant must be granted a new trial.

Because we hold the trial court erred by denying Defendant's motion to suppress on the ground of marital privilege, we need not address Defendant's argument that the admission of these statements violated Defendant's right to due process of law.

II.

[2] Defendant also argues the trial court erred by denying his motion to suppress statements Defendant made to Officer Troball. Defendant argues the statements were obtained in violation of his

Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. "In *Miranda*[,] . . . the United States Supreme Court determined that the prohibition against self-incrimination requires that prior to a custodial interrogation, the alleged defendant must be advised that he has the right to remain silent and the right to the presence of an attorney." *State v. Warren*, 348 N.C. 80, 97, 499 S.E.2d 431, 440 (citing *Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726), *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998). "It is well established that *Miranda* warnings are required only when a [criminal] defendant is subjected to custodial interrogation." *State v. Patterson*, 146 N.C. App. 113, 121, 552 S.E.2d 246, 253 (citation omitted), *disc. review denied*, 354 N.C. 578, 559 S.E.2d 549 (2001).

In the present case, it is undisputed that Defendant was in custody at the time he made the challenged statement and that Officer Troball did not advise Defendant of his *Miranda* rights. We must therefore determine whether Defendant was "interrogated" within the accepted meaning of that term. In support of its denial of Defendant's motion to suppress, the trial court concluded: "[O]fficer Troball engaged in conversation with [D]efendant while transporting him to another correctional facility, and thus, did not formally interrogate . . . [D]efendant." However, by concluding that simply because Officer Troball engaged in conversation with Defendant and therefore did not "formally interrogate" Defendant, the trial court misapprehended the definition of the term "interrogation."

> The term "interrogation" is not limited to express questioning by law enforcement officers, but also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

*State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Our Supreme Court further explained:

> The focus of the definition is on the suspect's perceptions, rather than on the intent of the law enforcement officer, because

*Miranda* protects suspects from police coercion regardless of the intent of police officers. *See Innis,* 446 U.S. at 301, 64 L. Ed. 2d at 308. However, because "the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-02, 64 L. Ed. 2d at 308.

*Id.*

In the present case, Officer Troball testified that prior to transporting Defendant on 15 December 2003, he "had heard through several inmates talking, not to [him] but just talking, that [Defendant] supposedly had murdered a woman." Officer Troball testified that he and Defendant were engaged in conversation and that Defendant asked him some questions about state law and about DNA. However, Officer Troball also testified that he asked Defendant what happened to the other man who was with Defendant at the murder. Officer Troball testified that he initiated questioning related to the murder and that before he asked the question regarding the other person involved in the murder, he and Defendant had not talked about Defendant being charged with murder. Officer Troball also testified that he asked the question regarding the other person involved in the murder because he had "heard inmates talking that the young man hung himself or killed himself in some sort of way[.]"

Based upon the findings of fact and Officer Troball's testimony, it is clear that Officer Troball had heard that Defendant had murdered a woman. Officer Troball had also heard that another person was involved in the murder and had "hung himself or killed himself in some sort of way." Although Defendant and Officer Troball were engaged in conversation, Officer Troball initiated the questioning regarding the murder. By doing so, Office Troball steered the conversation to a topic which, if discussed by Defendant, was likely to elicit an incriminating statement. We hold that under these circumstances, Officer Troball's question was reasonably likely to elicit an incriminating response from Defendant. *See Golphin,* 352 N.C. at 406, 533 S.E.2d at 199. In *Innis,* the United States Supreme Court noted: "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Innis,* 446 U.S. at 301 n.5, 64 L. Ed. 2d at 308 n.5. In the present case, even though the State's theory of the case was that Defendant acted alone, it appears that the State sought to introduce Defendant's

MISSION HOSPS., INC. v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[189 N.C. App. 263 (2008)]

statement to Officer Troball at trial. Accordingly, Defendant's response to Officer Troball's question was an incriminating response. We hold the trial court erred by denying Defendant's motion to suppress Defendant's statement to Officer Troball.

New trial.

Judges BRYANT and GEER concur.